RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0108p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

  *v.*

KIM DUBRULE (14-6290); ROSAIRE DUBRULE (14-6376),

     *Defendants-Appellants.*

Nos. 14-6290/6376

———————————

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:07-cr-20246—S. Thomas Anderson, District Judge.

Argued:  March 9, 2016

Decided and Filed:  May 6, 2016

Before:  CLAY, GILMAN, and GRIFFIN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**  Doris A. Randle-Holt, FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, Appellant in 14-6290.  Megan L. Rodgers, COVINGTON & BURLING LLP, Washington, D.C., Appellant in 14-6376.  Sonja Ralston, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Doris A. Randle-Holt, FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, Appellant in 14-6290.  Megan L. Rodgers, Benjamin C. Block, Catlin M. Meade, COVINGTON & BURLING LLP, Washington, D.C., Appellant in 14-6376.  Sonja Ralston, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge.   Defendant Rosaire Dubrule ("Mr. Dubrule" or "Dubrule"), a former medical doctor, was convicted on one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, and forty-four counts of distributing controlled substances in violation of 21 U.S.C. § 841(a)(1).   Defendant Kim Dubrule ("Kim"), Mr. Dubrule's wife and medical assistant, was convicted of conspiring with her husband to distribute controlled substances in violation of 21 U.S.C. § 846.   The district court sentenced Rosaire Dubrule to 150 months' imprisonment and Kim Dubrule to 18 months' imprisonment.   Both Mr. Dubrule (Appeal No. 14-6376) and Kim Dubrule (Appeal No. 14-6290) appeal from their judgments of conviction, raising issues concerning Mr. Dubrule's mental health.

In Appeal No. 14-6376, Mr. Dubrule argues that: (1) the district court erred by finding him competent to stand trial and proceed with sentencing; (2) the district court erred by failing to *sua sponte* order a competency hearing either before or during trial; (3) his pre-trial attorney and standby counsel at trial provided ineffective assistance by failing to request a competency evaluation; (4) the district court erred by holding that he had waived his insanity defense; and (5) his due process and Sixth Amendment rights were violated when the district court, in making its competency determination, relied upon an expert opinion that misleadingly claimed to be "peer reviewed."   In Appeal No. 14-6290, Kim Dubrule argues that she is entitled to a new trial because Mr. Dubrule's post-trial competency evaluation constituted newly discovered evidence that Mr. Dubrule was incapable of forming a conspiracy.

For the reasons set forth below, we **AFFIRM** the district court's judgments as to both Defendants.

**BACKGROUND**

**A.      Pre-trial events**

In August 2004, federal agents executed a warrant to search Rosaire Dubrule's medical office in connection with an investigation into Dubrule's alleged operation of a "pill mill"—a medical clinic known for freely prescribing highly addictive prescription pain medication.  Soon thereafter, the Tennessee Board of Medical Examiners ("TBME") held hearings that culminated in an order, signed by Mr. Dubrule, suspending his medical license and stipulating that he had prescribed controlled substances "not in good faith . . . or in amounts and/or for durations not medically necessary."  (R. 205, PageID 2195.)

On August 15, 2007, a grand jury indicted Rosaire and Kim Dubrule (collectively "Defendants") on charges stemming from the same federal investigation.  Defendants were released on bond.  Mr. Dubrule initially retained the same attorneys who had represented him during his hearings before the TBME.  But soon after he was indicted, Mr. Dubrule fired those attorneys "abruptly" and "without warning" during a hearing before a magistrate judge.  (A. 44, at 97.)  Dubrule thereafter filed three pre-trial motions *pro se*, including a motion to suppress, a motion requesting access to the transcripts of the grand jury proceedings, and a motion seeking the return of certain items seized during the August 2004 search of his medical office.  After these motions were denied, Dubrule retained Marty McAfee as counsel.

In July 2008, the government filed a motion to revoke Mr. Dubrule's bond, citing several incidents that had occurred during pendency of the criminal proceedings.  In one incident, Mr. Dubrule was arrested for reckless driving, driving while intoxicated on prescription drugs, and resisting arrest.  Immediately after his arrest, Dubrule made a number of bizarre statements, including that the government was "trying to kill him and that he was a world famous physician. Dubrule also went into a [tirade] about how hurricane Katrina was caused by the government and that Jewish people were responsible for destroy[ing] the dams in New Orleans."  (R. 52, PageID 120.)  In a separate incident, Dubrule sent a letter to the Tennessee Department of Health, asserting that the transcripts of his 2004 hearings before the TBME contained "critical omissions."  (*Id.* at 122.)  Among those omissions, he alleged, was testimony

about the stock market securities con game which was realized in only 30 days when Merck corporation suffered a contrived loss of 1.6 BILLION dollars in one day. Of greater interest to the public however will be the coverup [sic] of deviant sexual assault against children to cover up theft of privilege.

(*Id.*) The government's motion to revoke Mr. Dubrule's bond concluded that "it appears [Mr. Dubrule] is acting erratically and may be using drugs illegally or dealing with mental health issues." (*Id.* at 123.) The motion was referred to a magistrate judge who ultimately allowed Mr. Dubrule to remain free under modified conditions.

In September 2008, McAfee moved to withdraw as Mr. Dubrule's counsel. McAfee's motion stated that working with Dubrule was difficult because he "focus[ed] all of his attention on conspiracy theories." (R. 64, PageID 138.) Nevertheless, McAfee declared his belief that Dubrule was competent; McAfee opined that Dubrule may have been "taking his advice elsewhere." (*Id.*) The magistrate judge later granted McAfee's motion, citing "the continued breakdown in communications with counsel and the failure of Dubrule to pay his legal fees." (R. 73, PageID 146.)

Upon McAfee's withdrawal, Mr. Dubrule moved to proceed to trial *pro se*. A hearing on this motion was held before the magistrate judge, at which Dubrule testified that he had taken correspondence courses in law, had studied "the law as it relates to pain medicine," had familiarized himself with Federal Rules of Criminal Procedure 12–24, was studying the crimes with which he was charged, and would locate and familiarize himself with the Federal Rules of Evidence. (R. 345, PageID 3370–72, 3387.) Dubrule also stated that he had successfully represented himself in prior legal disputes, that he understood he was facing "very serious penalties" if convicted (*id.* at 3376), and that he had been advised by his former attorneys regarding the import of the federal sentencing guidelines. During the hearing, the magistrate judge asked no questions and made no findings regarding Mr. Dubrule's mental health.

The magistrate judge ultimately granted Dubrule's motion to proceed *pro se*, but ordered that an attorney from the CJA panel be appointed to serve as Mr. Dubrule's "standby or elbow counsel" during trial. (*Id.* at 3391.) Attorney Ross Sampson was later selected to serve in that capacity. Mr. Dubrule thereafter filed another series of pre-trial motions raising sometimes

valid—though more often ill-conceived—legal arguments. One of these motions asserted that Dubrule had been the victim of "government break-ins" prior to the 2004 search of his medical office (R. 113, PageID 237–38); a second motion stated that the TBME order that he signed "was created in relation to a financial scheme," and cryptically alleged that his leg was "intentionally broken in a related incident." (R. 128, PageID 302–03.)

**B.     Trial**

Defendants' cases proceeded to trial on July 28, 2010. During its case in chief, the government presented documents and witness testimony indicating that between 2002 and 2004, Defendants issued more than 30,000 prescriptions for controlled substances. This number was alarming, given that Dubrule maintained a solo practice in a town of about 4,000 people. Witnesses testified that patients traveled from neighboring towns, counties, and states to see Mr. Dubrule due to his reputation for prescribing controlled substances. An agent with the Tennessee Bureau of Investigation testified that on a single day during the course of the Dubrules' "pill mill" conspiracy—January 5, 2004—Mr. Dubrule saw 75 different patients, all of whom received a prescription for opioids. On that day alone, Mr. Dubrule prescribed some 7,539 pills. Witnesses testified the Kim Dubrule played a significant role in the distribution of controlled substances; she would often fill out pre-signed prescription pads when patients returned to the clinic looking for refills.

Acting as his own attorney, Mr. Dubrule presented a defense premised on the medical appropriateness of his prescriptions. Specifically, Dubrule argued that his patients were suffering from untreated chronic pain. During the proceedings, Dubrule questioned patients about improvements in their conditions during treatment. He also testified on his own behalf, focusing on particular patients and the reasons why he prescribed certain medications at particular times. Kim Dubrule's defense strategy largely involved deflecting blame on to Mr. Dubrule. Through appointed counsel, Kim argued that "it's the doctor's responsibility" to make medical decisions, and that as a medical assistant, she was merely following Mr. Dubrule's directions. (R. 203, PageID 2116, 2128.)

During trial, Mr. Dubrule's questioning and narrative testimony were on many occasions subject to objections for relevancy, hearsay, and lack of foundation.  When facing such objections, Dubrule often defended the reasoning behind his questioning and testimony.  He responded to sustained objections by either rephrasing his question or moving on to a different topic.  Trial transcripts also indicate several instances in which Mr. Dubrule apparently consulted with his standby counsel.  At two points during trial, Mr. Dubrule inquired about the appropriate procedure for filing a Rule 29 motion for judgment of acquittal.  He also asked the court whether a favorable ruling on Kim Dubrule's Rule 29 motion would affect his own case: "Your Honor, being a nonlawyer, if you do rule on that motion in favor of dismissal of the [conspiracy] charges against my wife, would that not automatically allow the conspiracy charge to be dropped against me?  Because doesn't it take more than one person to be in a conspiracy?" (R. 201, PageID 1718–19.)

## C.    Post-trial events

On August 11, 2010, the jury returned verdicts of guilty on all counts against both Defendants.  After filing several unsuccessful post-trial motions *pro se*, Dubrule requested appointment of counsel.  That motion was granted, and Sampson was appointed as Dubrule's attorney.  As his first act as Mr. Dubrule's attorney, Sampson moved for an evaluation of Dubrule's competence to proceed to sentencing.  In this motion, Sampson expressed his opinion that Mr. Dubrule might be suffering from "an underlying, undiagnosed psychotic and/or personality disorder." (R. 182, PageID 498.)  The motion was granted, and Dubrule was subjected to a mental evaluation by Dr. Jeremiah Dwyer.  Dr. Dwyer, a forensic psychologist for the Bureau of Prisons ("BOP"), evaluated Mr. Dubrule for approximately eight hours in early 2011, conducting a series of tests and face-to-face interviews.  Dr. Dwyer thereafter submitted a report opining that Mr. Dubrule apparently suffered from paranoid or grandiose delusions, and that such delusions rendered him incompetent to proceed to sentencing.

On May 19, 2011, Kim Dubrule filed a motion pursuant to Federal Rule of Criminal Procedure 33(b)(1), arguing that Dr. Dwyer's report constituted "newly discovered evidence" warranting a new trial.  (R. 192, PageID 519.)  A minute entry for proceedings held on June 30, 2011 indicates that the district court decided "to delay ruling on" the motion, presumably until

after issues of Mr. Dubrule's competency had been fully resolved. (*See* R. 206.) However, the record below does not contain any order explicitly disposing of Kim Dubrule's motion for a new trial.

Based on Dr. Dwyer's report, Mr. Dubrule's counsel moved for an evaluation of Dubrule's competence at the time of trial and at the time of the offenses.[1] The motion was granted, and a second evaluation was conducted by Dr. David Morrow. Dr. Morrow was also a forensic psychologist for the BOP. He evaluated Mr. Dubrule for approximately seven or eight hours in late 2011 and early 2012; he also reviewed the trial transcripts. In his resulting report, Dr. Morrow asserted that Dubrule suffered from personality and delusional disorders. Dr. Morrow opined that such disorders evidently impaired Dubrule's ability to represent himself at trial because, based on Dubrule's raw intelligence, he "should have been able either to present a much more coherent defense or to have accepted a plea agreement prior to trial." (A. 44, p. 73.) Finally, Dr. Morrow's report concluded that Dubrule required treatment before any firm conclusions could be made about his sanity at the time he committed the offenses.

Citing concerns with the quality of the reports prepared by Drs. Dwyer and Morrow, the government moved for a third evaluation by a new expert. That order was granted, and Mr. Dubrule was thereafter evaluated by Dr. Bernice Marcopulos. Dr. Marcopulos was a consultant for The Forensic Panel[2] and a published professor of clinical psychology and neuropsychology at James Madison University. Her evaluation of Dubrule lasted roughly two-and-a-half days. Dr. Marcopulos interviewed Mr. Dubrule, several of his family members, and former colleagues, employees, and attorneys; she conducted multiple tests; and she reviewed the trial transcripts, pre- and post-trial motions, and the reports prepared by Drs. Dwyer and Morrow. Although the government's motion to have Dubrule evaluated by Dr. Marcopulos stated that her final report

---

[1]The district court later construed Mr. Dubrule's "motion to determine competency . . . during commission of the indicted offenses" as a late notice of intention to assert an insanity defense under Federal Rule of Criminal Procedure 12.2(a). (*See* R. 255, PageID 2809–11.)

[2]According to the government's motion for a competency evaluation, "The Forensic Panel is a group of psychiatrists and psychologists that specialize in forensic evaluations." (R. 228, PageID 2403.) Dr. Marcopulos testified that when hired to provide an expert opinion, "The Forensic Panel . . . will examine the case to see what type of expert might be most appropriate," will assign a "primary forensic examiner" to conduct an evaluation of the defendant, and will make other experts available for consultation and review of the final report. (R. 252-1, PageID 2643.)

would be "peer reviewed" by other members of the Forensic Panel, in fact her evaluation process itself was developed in consultation with two colleagues from the Panel.

As with the prior two evaluators, Dr. Marcopulos concluded that Dubrule suffered from personality and delusional disorders. Unlike Drs. Dwyer and Morrow, however, Dr. Marcopulos opined that Dubrule's disorders did not make him incompetent to stand trial, represent himself, or proceed to sentencing. Her report stressed the fact that "competency is a task-specific ability" (A. 44, p. 115), and that her interviews, Dubrule's test results, and the trial transcripts all indicated that Dubrule was up to the task. Dr. Marcopulos' report also discussed evidence indicating that Mr. Dubrule was sane at the time of the alleged offenses.

After receiving Dr. Marcopulos' report, the district court held two competency hearings at which it heard testimony from Drs. Dwyer, Morrow, and Marcopulos; the court also heard testimony from Marty McAfee, Mr. Dubrule's former attorney. During those hearings, all three experts testified to and were cross-examined on their qualifications, their evaluation processes, and the bases for their conclusions. Notably, Dr. Marcopulos testified that her interviews with Mr. Dubrule revealed that some of his delusions were not "firmly held"—that is, when confronted with contradictory evidence, Dubrule would often back away from his apparently delusional claims. McAfee testified that during strategy meetings, Mr. Dubrule would "almost always . . . talk[] about his conspiracy theories, which are numerous and legion." (R. 252, PageID 2608.) On cross examination, however, McAfee reaffirmed the statement in his motion to withdraw that Mr. Dubrule "had everything he needed to proceed competently." (*Id.* at 2620.) McAfee also testified that Dubrule participated in discussions regarding the hiring of an outside expert to evaluate the government's case by offering names of potential experts.

### D. The district court's order on competency

On October 1, 2013, the district court issued a forty-one-page order and opinion concluding that Mr. Dubrule (1) was competent to stand trial, (2) was competent to proceed to sentencing, and (3) had waived his insanity defense by failing to raise it prior to trial. In finding that Dubrule was competent to stand trial and proceed to sentencing, the district court relied heavily on Dr. Marcopulos' testimony and report, which it described as "exhaustive and

detailed." (R. 255, PageID 2798.) The court credited Dr. Marcopulos as having "more specialized expertise" in competency determinations (*id.* at 2798), and found that her report was more thorough and convincing than both Dr. Dwyer's and Dr. Morrow's. The district court also relied on its own observations of Mr. Dubrule at trial, Dubrule's use of pre-trial motions and the arguments made therein, Dubrule's discussions with his attorneys and his reasoned decision to represent himself *pro se*, and the fact that the government's request for revocation of Dubrule's bond was based primarily on Dubrule's abuse of controlled substances.

After the district court denied Defendants' motions for reconsideration, their cases proceeded to sentencing. On October 21, 2014, the district court entered judgment of conviction as to Kim Dubrule, sentencing her to 18 months' imprisonment. On November 7, 2014, the district court entered its judgment as to Rosaire Dubrule, sentencing him to 150 months' imprisonment. Both defendants timely appealed from their respective judgments.

**Appeal No. 14-6376; Defendant Rosaire Dubrule**

**I.    THE DISTRICT COURT DID NOT CLEARLY ERR BY FINDING DUBRULE COMPETENT TO STAND TRIAL AND PROCEED TO SENTENCING**

**Standard of Review**

"A defendant's competence is a question of fact, which we review for clear error." *Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005). "A factual finding . . . 'will be deemed clearly erroneous only where it is against the clear weight of the evidence or when upon review of the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Grubbs*, 773 F.3d 726, 731 (6th Cir. 2014) (quoting *Smoot v. United Transp. Union*, 246 F.3d 633, 641 (6th Cir. 2001)). In the absence of such a definite and firm conviction, we cannot reverse the district court's findings—even if "[we] would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

**Analysis**

To be competent to stand trial or proceed to sentencing, a criminal defendant must possess (1) a "sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding," and (2) "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see also* 18 U.S.C. § 4241(a); *United States v. Washington*, 271 F. App'x 485, 490 (6th Cir. 2008) (applying the *Dusky* standard when evaluating defendant's competency to proceed to sentencing). In applying this standard, we have noted that "even if [the defendant is] mentally ill, '[i]t does not follow that because a person is mentally ill he is not competent to stand trial.'" *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996) (quoting *Newfield v. United States*, 565 F.2d 203, 206 (2d Cir. 1977)); *see also United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) ("the bar for incompetency is high"). Nor is a defendant "rendered incompetent . . . merely because he cannot get along with his counsel or disapproves of his attorney's performance." *Miller*, 531 F.3d at 349. And in cases where a criminal defendant elects to represent himself, "the mere fact that [he] espouses a far-fetched, or even bizarre, legal-defense theory is insufficient to clear the high hurdle for incompetency." *United States v. Davis*, 515 F. App'x 486, 493 (6th Cir. 2013).[3]

Below, the district court found Mr. Dubrule competent to stand trial and proceed to sentencing. In so finding, the district court thoroughly reviewed the three experts' opinions and ultimately found most persuasive Dr. Marcopulos' opinion that Dubrule was competent. On review of the record, we cannot say that this finding was clearly erroneous. *See Harries*, 417 F.3d at 635. The experts' reports and testimony established that Dr. Marcopulos possessed more training and experience in forensic psychology than Drs. Dwyer and Morrow, her opinion was based on a more extensive evaluation of Mr. Dubrule, and her conclusions were more thoroughly explained. These circumstances provided an adequate basis for giving Dr. Marcopulos' report more evidentiary weight. *See, e.g.*, *United States v. Mathis*, 738 F.3d 719, 740 (6th Cir. 2013) (holding no clear error where "the court thoughtfully considered and weighed the testimony from the parties' experts, finding the government's [expert] more persuasive"); *Bernier v. United States*, 816 F.2d 678 (6th Cir. 1987) (table) (holding same where "the magistrate chose to give greater weight to the defendant's expert witnesses because their

---

[3]Defendants note that this Circuit has never explicitly stated who bears the burden of proving a defendant's competency. However, because (1) the district court assumed that the burden rested with the government, (2) the district court found that the government had met its burden, and (3) we conclude that the district court's finding was not clearly erroneous, we decline to rule on the burden of proof issue in this case.

experience was qualitatively and quantitatively superior to plaintiff's expert witnesses' experience").

In addition to Dr. Marcopulos' opinion, the district court relied on its own observations of Dubrule's demeanor. Because Mr. Dubrule acted as his own attorney over the course of a ten-day trial, there was ample opportunity for the district court to interact with Mr. Dubrule, to observe his behavior, and to otherwise evaluate the extent of his "rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. Reflecting on these interactions, the district court opined:

> [A]s the trial progressed, Defendant generally complied with the Court's instructions and procedures. Defendant made an opening statement and a closing argument to the jury. Defendant cross-examined witnesses, sometimes posing relevant questions but other times raising irrelevant issues. . . . [The] evidence tends to show that Defendant understood his rights, the burden of proof in the case, and the role of the Court and the jury.

(R. 255, PageID 2800–01.) The district court also recalled that Dubrule "made motions with the Court, participated in sidebars and preliminary arguments, and appeared to comprehend routine trial procedure" (*id.* at 2800); he also "consulted with standby counsel throughout the trial." (*Id.* at 2799.)

On our review of the record, we conclude that these findings are not clearly erroneous. Although Dubrule's questioning and narrative testimony were frequently subject to objections, the trial transcripts indicate that Dubrule often defended himself against such objections; his arguments were coherent and occasionally successful. The colloquies between Dubrule and the court regarding the law of conspiracy and Rule 29 motions likewise demonstrated that Dubrule had a working knowledge of the relevant law, and that he maintained "a rational as well as factual understanding of the proceedings" as they progressed through the various stages of trial. *Dusky*, 362 U.S. at 402. And because the trial transcripts indicate several instances in which Mr. Dubrule apparently conferred with standby counsel, we find nothing clearly erroneous about the district court's recollection that Dubrule maintained the ability "to consult with his lawyer with a reasonable degree of rational understanding." *Id.*

The district court also relied on McAfee's statement, contained in his motion to withdraw, that "at this time it does appear to counsel that Defendant is competent to proceed." (R. 64, PageID 138.) On appeal, Mr. Dubrule notes that McAfee's motion also stated that working with Dubrule was difficult because he "focus[ed] all of his attention on conspiracy theories." (*Id.*) But the motion thereafter asserted that Dubrule "must be taking his advice elsewhere" (*id.*), suggesting a belief that Dubrule merely refused to take advice from McAfee in particular. Moreover, McAfee testified at the competency hearing that Dubrule substantively participated in discussions regarding the hiring of an outside expert to evaluate the government's case. In sum, record evidence supports the conclusion that Dubrule was capable of consultation when he so desired. Competency requires only "the ability" to consult with one's attorney, *Dusky*, 362 U.S. at 402; it does not require the defendant to do so in every instance. *See Miller*, 531 F.3d at 349.

The district court also concluded that Mr. Dubrule's bond revocation proceedings were not particularly relevant to an analysis of his competency. We find nothing clearly erroneous about that determination because the best-supported explanation for the erratic behavior prompting the bond revocation proceedings was Dubrule's abuse of prescription drugs. We likewise find no clear error in the district court's determination that Dubrule's pre- and post-trial filings merely "raised meritless arguments, indulged . . . misguided theories of the case, or misapplied the law." (R. 275, PageID 2870–71.) The majority of Dubrule's *pro se* motions contained no plainly delusional material. And when read in the context of the entire record, many of the potentially "delusional" statements in Dubrule's motions could be viewed as intentional, if wholly inartful, attempts to misrepresent the record or garner sympathy from the court. Although other interpretations of Dubrule's motions might be reasonable, we cannot reverse the district court simply because "[we] would have weighed the evidence differently." *Anderson*, 470 U.S. at 565.

Finally, we reject Mr. Dubrule's contention that his overconfidence before trial, and poor performance during trial, render the district court's finding of competence clearly erroneous. Dubrule relies on *United States v. Zaki*, No. 14-20281, 2015 WL 1004860, at *3–*4 (E.D. Mich. Mar. 6, 2015), in which the court found the defendant incompetent based partly on his

overconfidence in his likelihood of success at trial.   Notwithstanding the fact that *Zaki* is distinguishable because the defendant in that case exhibited more severe symptoms of incompetence than Mr. Dubrule, *see, e.g.*, *id.* at *3 (defendant believed "that God had facilitated mental communication between [him] and a [jail official]"), we note that a *pro se* defendant's overconfidence in his likelihood of success at trial, standing alone, seems a poor indicator of incompetence.

"It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Faretta v. California*, 422 U.S. 806, 834 (1975).   For that very reason, this Circuit "has adopted a rather lengthy series of questions from 1 *Bench Book for United States District Judges* 1.02–2 to –5 (3d ed. 1986) that a district court should ask in order to ensure that a defendant's waiver of counsel is knowing and intelligent." *United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004) (citing *United States v. McDowell*, 814 F.2d 245, 247, 250 (6th Cir. 1987)).   At the end of those questions is an explicit warning:[4]

> I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself.   I think it is unwise of you to try to represent yourself.   You are not familiar with the law.   You are not familiar with court procedure.   You are not familiar with the rules of evidence.   I would strongly urge you not to try to represent yourself.

*McDowell*, 814 F.2d at 251 (quoting the *Bench Book*).

Common sense would seem to instruct that a criminal defendant who chooses to represent himself after receiving this rather dire warning—from the judge, no less—is either grossly overconfident or actively engaged in some form of self-sabotage.   But it cannot be the case that a defendant's knowing and voluntary decision to exercise his right to self-representation necessarily indicates that he lacks the competence to proceed to trial.   *See Faretta*, 422 U.S. at 834 ("[A]lthough [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." (internal quotation marks omitted)).   Thus, Mr. Dubrule's expressions of

---

[4]Such a warning was issued to Mr. Dubrule at his *Faretta* hearing.

overconfidence do not provide us with "the definite and firm conviction that" the district court's finding of competence was clearly erroneous. *Grubbs*, 773 F.3d at 731.

Notably, Mr. Dubrule's expressions of "overconfidence" can only be so described because he proved ineffective at establishing his innocence. In that way, his argument on appeal also suffers from hindsight bias. That same bias undergirds Dubrule's second argument, in which he cites Dr. Morrow's conclusion that he "should have been able either to present a much more coherent defense or to have accepted a plea agreement prior to trial." (A. 44, p. 73.) The fact that he failed to do so despite his impressive intellect, the argument goes, constitutes a clear indication that he was suffering from a mental impairment that rendered him incompetent. We reiterate, however, that we are less persuaded by arguments and expert opinions that "tend to look back at decisions that turned out badly for [the defendant] and label them as irrational based on their ultimate outcome." *Harries*, 417 F.3d at 636 (internal quotation marks omitted). Indeed, giving dispositive weight to such arguments would provide *pro se* defendants with a guaranteed second bite at the apple. *Cf. McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984) (noting that "a defendant who exercises his right to appear *pro se* cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel" (internal quotation marks omitted)).

This is not to say that that a defendant who waives the right to counsel necessarily forgoes any claim that he was incompetent to stand trial. *See Indiana v. Edwards*, 554 U.S. 164, 177–78 (2008) ("[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so."). Rather, it is enough for our purposes to conclude that Mr. Dubrule's post-conviction hindsight is not a compelling enough basis on which to overturn the district court's considered determination of competency.

## II.     THE DISTRICT COURT DID NOT ERR BY FAILING TO ORDER A COMPETENCY EVALUATION *SUA SPONTE*

### Standard of Review

Under 18 U.S.C. § 4241, a district court "shall order [a competency] hearing on its own motion, if there is reasonable cause to believe" that the defendant is incompetent to stand trial or proceed to sentencing.  We have held that "[t]he district court has a measure of discretion in determining whether there is 'reasonable cause' to believe that a defendant is incompetent." *United States v. Jones*, 495 F.3d 274, 277 (6th Cir. 2007).  Thus, "[t]his Court reviews the determination of whether there is reasonable cause to question a defendant's competence . . . under an abuse of discretion standard." *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012) (citing *Jones*, 495 F.3d at 277); *United States v. Abdulmutallab*, 739 F.3d 891, 900 (6th Cir. 2014) ("On appeal, we review under an abuse of discretion standard a district court's determination whether there is 'reasonable cause' to believe that a defendant is incompetent and whether to hold a competency hearing.").  "A court abuses its discretion when it commits a clear error of judgment." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014) (quoting *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010)).

### Analysis

Under 18 U.S.C. § 4241, "the district court has not only the prerogative, but the duty, to inquire into a defendant's competency whenever there is 'reasonable cause to believe' that the defendant is incompetent to stand trial." *United States v. White*, 887 F.2d 705, 709 (6th Cir. 1989).  In determining whether there was "reasonable cause" to doubt the defendant's competency, we look to "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *see also id.* (noting that "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry"); *United States v. Tucker*, 204 F. App'x 518, 520 (6th Cir. 2006) ("In deciding whether or not to hold a competency hearing, a court may consider all of the information before it.").  The court may also consider an attorney's opinion about his client's competency. *Tucker*, 204 F. App'x at 520 (citing *Owens v. Sowders*, 661 F.2d 584, 586 (6th Cir. 1981)); *see also Miller*, 531 F.3d at 350 (considering trial counsel's failure to raise

competency issue). "[E]ven one of these factors standing alone may, in some circumstances, be sufficient" to warrant a competency hearing. *Drope*, 420 U.S. at 180.

Roughly five months after the jury rendered its guilty verdicts, the district court granted Mr. Dubrule's motion to determine his competency pursuant to 18 U.S.C. § 4241(b). On appeal, Dubrule argues that there was reasonable cause to question his competency prior to and during trial, and that the district court abused its discretion by failing to *sua sponte* order a competency evaluation earlier.[5] In support of his argument, Mr. Dubrule cites facts that, in his belief, should have created the "reasonable cause" necessary to issue such an order—namely, the government's motion to revoke his bond and the resulting order, his *pro se* pre-trial motions, and his apparently strained relationships with his attorneys.

These facts are examined in greater detail in section I, *supra*, where we conclude that the district court did not clearly err when it found that those facts did not render Dubrule incompetent. For similar reasons, we conclude that the district court did not "commit[] a clear error of judgment," *Yoder & Frey*, 774 F.3d at 1070, by failing to order a competency hearing *sua sponte* on the basis of the same facts. Because they were prompted by behavior apparently resulting from abuse of prescription drugs, Dubrule's bond revocation proceedings provided little basis for questioning his ability to conduct a defense when sober. Moreover, given the frequency with which *pro se* defendants distort the record, file unorthodox motions, and espouse strange theories, we decline to hold that the district court abused its discretion by failing to order a competency hearing on the basis of strange statements contained in a few of Dubrule's pre-trial motions. *See, e.g.*, *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003) (observing that "[m]any litigants articulate beliefs that have no legal support" and collecting examples of strange behavior that was not necessarily indicative of incompetence). And as explained above, the record supports the conclusion that Mr. Dubrule was simply unwilling, rather than unable, to cooperate with counsel.

---

[5]Mr. Dubrule also argues that the district court's post-trial competency evaluation was insufficient to safeguard his constitutional rights where there was reasonable cause to believe him incompetent earlier on. *See Pate v. Robinson*, 383 U.S. 375, 387 (1966) ("[W]e have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial."). Because we conclude that the district court did not abuse its discretion by failing to order an evaluation earlier, we do not address this argument further.

Most importantly, however, the facts on which Dubrule relies do not exist in a vacuum; the district court's reluctance to order a competency hearing was undoubtedly based on "all of the information before it." *Tucker*, 204 F. App'x at 520. In this case, such information included numerous hours of face-to-face interaction between Mr. Dubrule and the district court judge. We find here, as we have before, that "[t]he bare record that this court reviews on appeal is a poor substitute for the district court's personal observation of the defendant's demeanor and the district court's considered judgment of the defendant's ability to conduct trial proceedings." *United States v. Stafford*, 782 F.3d 786, 791 (6th Cir. 2015); *see also Indiana v. Edwards*, 554 U.S. 164, 177 (2008) ("[T]he trial judge . . . often prove[s] best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."). The district court's recollection of Dubrule's conduct during trial, as expressed in the order on competency, indicates that the court conscientiously observed Mr. Dubrule throughout the proceedings and found no reasonable cause to suspect incompetence.

For these reasons, we find no basis on which to conclude that the district court "commit[ed] a clear error of judgment" by failing to *sua sponte* order a competency hearing prior to or during trial. *See Yoder & Frey*, 774 F.3d at 1070.

## III. DUBRULE'S ATTORNEYS DID NOT PROVIDE INEFFECTIVE ASSISTANCE BY FAILING TO REQUEST A COMPETENCY EVALUATION PRIOR TO OR DURING TRIAL

### Standard of Review

We review *de novo* a defendant's claim of ineffective assistance of counsel. *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995). "Judicial scrutiny of counsel's performance must be highly deferential. We presume from the outset that a lawyer is competent, and therefore, 'the burden rests on the accused to demonstrate a constitutional violation.'" *Id.* (internal citation omitted) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)).

### Analysis

"A convicted defendant's charge that he was denied effective assistance of counsel, to be successful, requires that the defendant prove: (1) that counsel's performance was deficient; and

(2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Meeks v. Bergen*, 749 F.2d 322, 327 (6th Cir. 1984). To be constitutionally deficient, counsel's performance must "[fall] below an objective standard of reasonableness." *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "[C]ounsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency" might render counsel's performance objectively unreasonable, "provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency." *Jermyn v. Horn*, 266 F.3d 257, 283 (3d Cir. 2001). To demonstrate prejudice under that theory, however, Mr. Dubrule would need to prove that "there is a reasonable probability that, but for counsel's [failure to request a competency evaluation prior to or during trial], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Even assuming that objectively reasonable counsel in McAfee's and Sampson's positions would have requested a competency evaluation, Dubrule cannot demonstrate that any prejudice resulted from their failure to do so. In finding Mr. Dubrule competent, both the district court and Dr. Marcopulos closely examined facts arising out of the time periods during which McAfee and Sampson served as Mr. Dubrule's counsel. Those facts included: Dubrule's pre-trial motions; his apparently reasoned decision to proceed without counsel, as evidenced by his testimony during his *Faretta* hearing; McAfee's motion to withdraw; the bond revocation proceedings; and Dubrule's behavior during trial. Although we appreciate the "difficulty of retrospectively determining an accused's competence to stand trial," *see Pate v. Robinson*, 383 U.S. 375, 387 (1966), it is nevertheless Dubrule's burden to show a reasonable probability that an earlier evaluation of such evidence would have produced a different result. Because the district court's finding of competency was not clearly erroneous, and because Dubrule fails to point out evidence suggesting that the district court's finding would have been different had his competency been evaluated earlier, there is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY HOLDING THAT DUBRULE WAIVED HIS INSANITY DEFENSE**

**Standard of Review**

Federal Rule of Criminal Procedure 12.2(a) requires that a defendant provide notice of his intent to offer an insanity defense "within the time provided for filing a pretrial motion." If the defendant fails to file notice within that time, he "cannot rely on an insanity defense." Fed. R. Crim. P. 12.2(a); *United States v. Cox*, 826 F.2d 1518, 1521 (6th Cir. 1987) ("By its terms, . . . Rule 12.2(a) contemplates that a defendant who fails to comply with the time requirements waives his right to an insanity defense." (internal quotation marks omitted) (quoting *United States v. Duggan*, 743 F.2d 59, 80 (2d Cir.1984))). Here, there is no dispute that Dubrule's post-conviction arguments regarding "competence at the time of the offense" did not meet Rule 12.2(a)'s timing requirement.

However, Rule 12.2(a) states that "[t]he court may, *for good cause*, allow the defendant to file the notice late . . . ." Fed. R. Crim. P. 12.2(a) (emphasis added). This Court reviews a district court's good-cause determination for abuse of discretion. *See Cox*, 826 F.2d at 1521 (quoting *United States v. Veatch*, 674 F.2d 1217, 1224 (9th Cir. 1981), for the proposition that "[i]t is within the district court's discretion to grant or deny a defendant relief from the exclusion provision of Rule 12.2(a)" (internal quotation marks omitted)).

**Analysis**

"'Cause' consists not only of explanation for the belatedness of the party's action, but also of a showing of some merit in the position belatedly to be advanced." *Cox*, 826 F.2d at 1521 (internal quotation marks omitted). Mr. Dubrule argues that his belatedness in asserting an insanity defense was attributable to his incompetence to stand trial and to his self-representation while incompetent. The district court concluded that because Mr. Dubrule was competent to stand trial and represent himself, his excuse for belatedly asserting his insanity defense did not constitute "good cause." Because we affirm the district court's findings on competence, we conclude that the district court did not abuse its discretion by holding that Dubrule's alleged incompetence did not provide "good cause" for his belated filing.

**V.    THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR BY CONSIDERING DR. MARCOPULOS' REPORT AND TESTIMONY WHEN MAKING ITS COMPETENCY DETERMINATION**

**Preservation of the Issue and Standard of Review**

On appeal, Mr. Dubrule argues that the circumstances surrounding his evaluation by Dr. Marcopulos and the Forensic Panel violated his due process and Sixth Amendment rights. However, Dubrule concedes that this issue was not properly preserved below. This Court reviews unpreserved constitutional claims for plain error. *See United States v. Yancy*, 725 F.3d 596, 600–01 (6th Cir. 2013). "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).

**Analysis**

Mr. Dubrule asserts that "the government made . . . false representations about the Forensic Panel's 'peer review' process" because it failed to disclose that Dr. Marcopulos would consult with other experts from the Panel prior to completion of her report. (Def.'s Br. at 60–61.) He thereafter argues that

> [h]ad he known that the "peer reviewers" would be providing input to Dr. Marcopulos' evaluation and directly influencing the formation of her opinions about Dubrule's competency, [counsel] could have objected . . . , requesting that the process be adjusted and that the court include a specific procedure in its order.

(Def.'s Reply Br. at 30.) But even assuming for the sake of argument that depriving Dubrule's counsel of such an opportunity to object resulted in an obvious error, there is no reason to believe that the error affected Dubrule's substantial rights. *See Gardiner*, 463 F.3d at 459 ("To establish plain error, a defendant must show that . . . the error affected defendant's substantial rights."); *United States v. Cotton*, 535 U.S. 625, 632 (2002) (noting that affecting a defendant's substantial rights "usually means that the error . . . affected the outcome of the district court proceedings"). That is because Dr. Marcopulos described her evaluation process at the competency hearing, and

defense counsel had a full and fair opportunity to cross-examine her regarding her methodology at that time.

Furthermore, Mr. Dubrule's own experts testified as to their opinions on consultation between colleagues during the course of an evaluation. Dr. Dwyer stated that there is "nothing wrong" with such consultation, and that, in fact, such consultation is beneficial. (*See* R. 252, PageID 2527–28.) Indeed, Dr. Dwyer admitted on cross examination that, like Dr. Marcopulos, he consulted with a colleague "at the time . . . this evaluation was going on" regarding "clarification on diagnostic issues." (*Id.* at 2527.) Dr. Morrow likewise admitted that he "discussed [his report] with people," but that he did not mention such discussions in his report. (*Id.* at 2597.) In sum, there is nothing about the evidence in the record suggesting that Dr. Marcopulos' methods diminished the reliability of her opinion.[6] We therefore find no plain error in the circumstances of Mr. Dubrule's evaluation by Dr. Marcopulos.

**Appeal No. 14-6290; Defendant Kim Dubrule**

**VI.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING KIM DUBRULE'S MOTION FOR A NEW TRIAL**

**Standard of Review**

"This Court reviews for abuse of discretion a district court's judgment on a Rule 33 motion for a new trial." *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012).

**Analysis**

**A.     Jurisdiction**

On May 19, 2011, Kim Dubrule filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33(b)(1), arguing that Dr. Dwyer's post-conviction report finding Mr. Dubrule incompetent to proceed to sentencing constituted "newly discovered evidence." Specifically, Kim argued that this report raised new questions regarding Mr. Dubrule's capacity

---

[6]At the competency hearing, Dr. Marcopulos described the two experts with whom she consulted during the course of her evaluation of Mr. Dubrule. The first was Dr. Michael Wellner, a board certified psychiatrist that specialized in and had "extensive experience" with forensic cases. (R. 252-1, PageID 2648.) The second was Dr. Diana Goldstein, a board certified clinical neuropsychologist with a forensic practice. (*Id.* at 2648–49.)

to form the two-person conspiracy for which she was convicted. *See, e.g., United States v. Fowler*, No. 14-2412, 2016 WL 1381907, at *7 (6th Cir. Apr. 7, 2016) (noting that conviction for conspiracy requires "an agreement with two or more persons"). However, the district court never issued an order explicitly denying Kim Dubrule's motion for a new trial. We raised this apparent discrepancy at oral argument, and the parties thereafter submitted letter briefs addressing whether we possess jurisdiction on appeal to rule on Kim's motion for a new trial.

Unsurprisingly, Kim does not challenge our ability to review her own appeal. However, she provides no legal authority in support of our jurisdiction to do so. The government agrees that we should review Kim's appeal on the merits, arguing that we have jurisdiction because: (1) 28 U.S.C. § 1291(a) grants appellate jurisdiction over the district court's "final decisions;" and (2) the district court's entry of judgment of conviction against Kim Dubrule on October 21, 2014, from which she now appeals, constituted a "final decision" despite the lack of an explicit ruling on her motion for a new trial. In support of its argument, the government cites *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981), for the principle that entry of final judgment implicitly denies pending motions. We find the government's argument persuasive under the factual circumstances of this case.

We have previously held that 28 U.S.C. § 1291 grants appellate jurisdiction over claims implicitly denied by an otherwise final decision. *See Ford Motor Co. v. Transp. Indem. Co.*, 795 F.2d 538, 542 (6th Cir. 1986) (holding that if a "district court's ruling on one claim necessarily precludes an alternative or mutually exclusive claim, a final order will arise despite the lack of an explicit declaration by the district court"); *A.O. Smith Corp. v. United States*, 774 F.3d 359, 369 (6th Cir. 2014) (citing *Ford Motor Co.* for the proposition that the Court had jurisdiction to review a claim where "the district court implicitly rejected it"). And we have held, under circumstances similar to those in this case, that a district court's imposition of a sentence and entry of judgment implicitly denied a criminal defendant's pending motion. *See United States v. Burress*, 105 F. App'x 766, 769 (6th Cir. 2004).

Moreover, those of our sister circuits to have commented on this issue appear to agree that entry of final judgment constitutes an implicit denial of pending motions. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 882 (7th Cir. 2012) ("Final judgment necessarily denies

pending motions." (internal brackets and quotation marks omitted)); *United States v. Jasso*, 634 F.3d 305, 307 n.2 (5th Cir. 2011) (holding that "the denial of a pending motion may be implied by the entry of final judgment"); *Toronto-Dominion Bank v. Cent. Nat. Bank & Trust Co.*, 753 F.2d 66, 68 (8th Cir. 1985) ("Denial of a pending motion may be implied from the entry of final judgment or any order inconsistent with the granting of the motion."); *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981) ("The denial of a motion by the district court, although not formally expressed, may be implied by the entry of final judgment."); *Pinson v. Berkebile*, 576 F. App'x 710, 711 (10th Cir. 2014) ("[B]y entering final judgment, the court implicitly denied the pending motions."); *Gorrell v. Hastings*, 541 F. App'x 943, 946–47 (11th Cir. 2013) ("When a district court does not expressly rule on a party's pending motion, the entry of a final judgment against the party, as a general matter, implicitly denies that motion.").

Based on these principles, we conclude that we have jurisdiction to hear Kim Dubrule's appeal. As we discuss below, the district court's holding that Mr. Dubrule was competent to stand trial and proceed to sentencing undermined the basis for, and therefore essentially denied, Kim's motion for a new trial. And in any event, Kim's pending motion was implicitly denied by the district court's entry of her sentence and final judgment of conviction on October 21, 2014.

**B.      Denial of Kim Dubrule's motion for a new trial**

In order to establish that evidence was "newly discovered" for the purposes of justifying a new trial, "a defendant must normally show that the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried." *United States v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993). As noted above, Kim Dubrule's motion for a new trial relies on Dr. Dwyer's post-conviction report discussing Mr. Dubrule's personality disorders and finding him incompetent to proceed to sentencing. But the district court ultimately found Dr. Dwyer's report unpersuasive, holding that Mr. Dubrule was competent to stand trial and proceed to sentencing despite any disorders. For the reasons already discussed in this opinion, that factual finding was not clearly erroneous.

We conclude that the district court did not abuse its discretion by implicitly denying Kim's motion for a new trial where that motion was premised on a report that the district court found unpersuasive. In so doing, we are cognizant of the fact that the standards for competency and insanity are different. *See, e.g.*, *Duran v. Attorney Gen. of N.M.*, 565 F. App'x 719, 722 n.1 (10th Cir. 2014) (citing *Medina v. California*, 505 U.S. 437, 448–49 (1992), for the principle that "a defendant who is found competent to stand trial may also have been insane (or unable to form specific intent) at the time he committed the crime"); 18 U.S.C. § 4241(f) (establishing that a finding of competency does not foreclose a defendant's insanity defense; nor is a determination of competency "admissible as evidence in a trial for the offense charged"). But that fact serves only to reinforce the tenuous nature of Kim's reliance on Dr. Dwyer's report—because that report concerned only Mr. Dubrule's competency, it was not dispositive of his capacity to form a conspiracy. The district court thus did not "commit a clear error of judgment," *see Yoder & Frey*, 774 F.3d at 1070, because such evidence was unlikely to "produce an acquittal if the case were retried," *see Garland*, 991 F.2d at 335.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment as to Rosaire Dubrule (Appeal No. 14-6376), and **AFFIRM** the district court's judgment as to Kim Dubrule (Appeal No. 14-6290).