RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee*,

*v.*

ROSSEN IOSSIFOV (21-5063/5404); DIMITRIOUS ANTOINE BROWN (21-5147),

> *Defendants-Appellants*.

Nos. 21-5063/5147/5404

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington;
No. 5:18-cr-00081—Robert E. Wier, District Judge.

Argued: April 26, 2022

Decided and Filed: August 12, 2022

Before: CLAY, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John Kevin West, STEPTOE & JOHNSON PLLC, Columbus, Ohio, for Appellant Iossifov. Thomas W. Kidd, Jr., KIDD & URLING LLC, Harveysburg, Ohio, for Appellant Brown. Ann O'Connell Adams, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** John Kevin West, STEPTOE & JOHNSON PLLC, Columbus, Ohio, for Appellant Iossifov. Thomas W. Kidd, Jr., KIDD & URLING LLC, Harveysburg, Ohio, for Appellant Brown. Ann O'Connell Adams, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Kathryn Anderson, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   In this consolidated appeal, Defendants Rossen Iossifov and Dimitrious Brown challenge the district court's judgments after they were convicted and sentenced on Racketeer Influenced and Corrupt Organizations Act ("RICO Act") charges, *see* 18 U.S.C. § 1962(d), and, in Iossifov's case, an additional charge for conspiring to launder money, *see* 18 U.S.C. § 1956(h).   For the reasons set forth in this opinion, the Court **AFFIRMS** Defendant Iossifov's convictions and sentence and **AFFIRMS** Defendant Brown's sentence.

## I.  BACKGROUND

### A.  Factual Background

These consolidated cases stem from a fraud scheme carried out by a Romanian organization known as the Alexandria Online Auction Fraud Network ("AOAF Network" or "the network").   The parties agree that the network used fraudulent online advertisements on websites like eBay, Craigslist, and Amazon to convince unknowing purchasers in the United States to send payments for high-value items that did not actually exist.   After receiving the payments through vehicles like gift cards and prepaid debit cards, AOAF Network money launderers in the United States, including Brown, converted the payments into Bitcoin currency, which was then transferred back to Romania.   Foreign Bitcoin exchange businesses including RG Coins, Iossifov's business based in Bulgaria, then transferred the Bitcoin balances to cash on behalf of the AOAF Network fraudsters.   Victim purchasers never received the items for which they paid.[1]

The AOAF Network carried out its scheme between 2013 and 2018.   The government learned about the network in late 2014 when it discovered that an American citizen living in the Eastern District of Kentucky was laundering funds on behalf of an online fraud organization. Law enforcement officials confronted the individual in June 2015, at which point the individual became a confidential source ("CS") and began to act in furtherance of the scheme under the

---

[1]According to the government, there were approximately 900 victims in total.

government's supervision. The parties agree that the CS's conduct took place in the Eastern District of Kentucky.

### i. Iossifov's Conduct and Involvement

Through its investigation, the government learned that Iossifov exchanged Bitcoin for fiat currency in Europe. It discovered that the AOAF Network used Iossifov's services because Iossifov did not ask network members to provide any identification or information regarding the source of the funds to be exchanged. Nor did Iossifov's business hesitate to exchange large sums of digital currency into cash payments. Benjamin Ologeanu, a co-defendant and network member, testified that he and his co-conspirators specifically favored Iossifov's exchange business because the network intended to make its transactions difficult to trace.

Iossifov's conduct violated his business' own purported anti-money laundering ("AML") policies, which RG Coins was required to have in place in order to conduct transactions through large Bitcoin exchanges. Indeed, in communications with the large exchanges, Iossifov represented that RG Coins identified all clients with an identity card or passport; required them to sign an AML declaration; inquired about the source of the funds to be traded; refused to engage in cash transfers for transactions over 10,000 leva (Bulgarian currency); and otherwise had policies in place to prevent, detect, and report suspicious transactions.

Various witnesses who were familiar with, or involved in, the fraud scheme testified that Iossifov did not, in fact, follow any of these policies. In total, six AOAF Network co-defendants testified that they transacted with Iossifov and never came across any AML procedures. Defendant Popescu, a director of the organization, testified that he conducted AOAF business using an alias, and that he was able to trade funds through Iossifov's exchange business without ever providing his real name or any form of identification. Defendant Ologeanu stated that he had the same experience, and he added that he often sent intermediaries to retrieve the cash. According to Ologeanu, none of the intermediaries were ever asked for identification.

The co-conspirators also testified that Iossifov never asked them about the origin of the funds. Indeed, on one occasion when Defendant Sandu asked Iossifov to give him the money without an identification, "no questions asked," an email account associated with Iossifov replied

that it would be "[n]o problem." (Trial Tr. Day 4, I.R.**2** 1106, Page ID # 8748.) Law enforcement officials involved in the government's investigation similarly stated that they had found no evidence that Iossifov ever sought to verify the origin of the funds that he exchanged through RG Coins. Nevertheless, Iossifov testified that he followed Bulgarian law with regard to transaction identification requirements, including asking customers for their identification and for a declaration regarding the source of their money. He then stated that any testimony to the contrary was untrue.

At trial, Iossifov also stated that he did not know that his Romanian customers were engaged in fraudulent activities until he was arrested and extradited to the United States—a contention that he maintains before this Court. Over his objections, however, and in addition to Popescu and Ologeanu's testimony, Defendant Stoica specifically testified to the contrary. Stoica stated that Iossifov did indeed know that some of the Bitcoin he exchanged came from fraudulent sources. He testified that Sandu had previously mentioned that Iossifov offered to assist Sandu with securing additional fraudulent advertisements. Additionally, the government produced emails showing that Iossifov agreed to pack cash prior to the exchange, out of view of other customers, and that he agreed to place the money in "a paper bag," ahead of Sandu's arrival at the storefront, in part so that Sandu could avoid any possible encounters with other people. (Trial Tr. Day 5, I.R. 1107, Page ID # 8968–70.) When confronted with the email at trial, Iossifov said that he "personally [did] not see anything suspicious," with the request to pack cash in a paper bag, "and that's why [he] continued to work with this guy." (*Id.* at Page ID # 8970.) The government also confronted Iossifov with RG Coins emails in which the business agreed to support a customer with "any problems" relating to proof of the source of exchanged funds, possible police encounters, and confiscation. (*Id.* at Page ID # 8971.) Iossifov admitted that the emails came from his business, but he argued that they were not directly attributable to him.

---

**2**Defendant Iossifov's district court record, Case No. 5:18-cr-00081-15, is identified by the initials "I.R." throughout the opinion. Defendant Brown's district court record, Case No. 5:18-cr-00081-18, is identified by the initials "B.R."

The government also produced evidence that RG Coins exchanged Bitcoin for other criminal networks. Marko Leopard, a Macedonian fraudster formerly associated with an international cybercrime organization known as "Infraud," testified that he exchanged Bitcoin at RG Coins on its behalf. Leopard stated that he was introduced to Iossifov by another online fraudster named Nemanja, and that after Nemanja made the introduction, Iossifov gave Leopard a "VIP card" to use at RG Coins. According to Leopard, the card provided him with discounts for Iossifov's services. Leopard testified that he exchanged high-value sums of Bitcoin at RG Coins, and he added that all of the exchanges were for cash. Leopard emphasized that Iossifov never requested any form of identification or declaration about the source of the funds in order to carry out trades. Like Ologeanu and Sandu on behalf of the AOAF Network, Leopard sent intermediaries to retrieve the exchanged funds on various occasions.

### ii. Brown's Conduct and Involvement

Brown admitted to his participation in AOAF Network transactions at the other end of the scheme. He specifically stipulated that he converted fraudulent proceeds contained in debit cards, gift cards, money orders, and bank wires into more liquid methods of payment like cash and Bitcoin between March 2015 and March 2017. Brown also acknowledged that he knew that the funds came from online fraud, and that he nevertheless joined the scheme voluntarily. He admitted that he directly laundered or attempted to launder $664,460 worth of proceeds. Finally, Brown confessed that he assisted the confidential source in procuring false identifications. He agreed that he shipped four fake driver's licenses to the confidential source's location in the Eastern District of Kentucky.

## B. Procedural History

### i. Iossifov's Trial, Conviction, and Sentence

In July 2018, the government charged Defendant Iossifov with one count of conspiring to engage in racketeering activity, in violation of the RICO Act, 18 U.S.C. § 1962(d), and one count of conspiring to launder money, in violation of 18 U.S.C. § 1956(h). A jury convicted Iossifov on both counts in September 2020. Iossifov moved for a Rule 29 judgment of acquittal on the basis that the evidence failed to establish that he knowingly and willfully joined the conspiracy.

Several months later, Iossifov also moved for a new trial on the basis that he had received newly discovered evidence regarding the credibility of Marko Leopard, which he claimed would have changed the outcome of his trial.

The district court denied Iossifov's motions and sentenced him to 121 months of imprisonment with no additional period of supervised release. In so doing, the district court applied United States Sentencing Guidelines ("U.S.S.G.") § 3C1.1 over Iossifov's objection, thus increasing his offense level by two points for obstruction of justice after finding that Iossifov provided false testimony at trial. Also over his objection, the court increased Iossifov's base offense level by 18 points under U.S.S.G. § 2B1.1(b)(1)(J) pursuant to its calculation of the sum of laundered funds attributable to him, namely, $ 4.9 million.[3] Iossifov timely appealed from his convictions and corresponding sentence.

### ii. Brown's Conviction and Sentence

In February 2019, the government also charged Defendant Brown with one count of conspiring to engage in racketeering activity in violation of the RICO Act. *See* 18 U.S.C. § 1962(d). Brown pleaded guilty in February 2021, and the district court sentenced him to 78 months of imprisonment and three years of supervised release. Over Brown's objection, the district court increased his base offense level by two points for obstruction of justice because it found that Brown tried to "disrupt, distract, and perhaps delay the proceedings" by filing false 1099 IRS forms naming various individuals involved in his case, including district court Judge Wier and the Assistant United States Attorney prosecuting the case. *See* U.S.S.G. § 3C.1.1; (*see also* Sent'g Tr., B.R. 1092, Page ID # 7434; *see generally id.* at Page ID # 7430–37; Mot. Revoke Pretrial Release, B.R. 795, Page ID 4931; Brown Br. 4–5.) The court also increased Brown's base offense level by 16 points pursuant to U.S.S.G. § 2B1.1(b)(1)(I) due to its

---

[3]Had the district court sustained Iossifov's objections regarding the sentencing enhancements that he now raises on appeal, his offense level would have been 28 rather than 32. Accordingly, given his criminal history category of I, the applicable guidelines range would have been 78–97 months rather than 121–151 months. *See* Sent'g Table, U.S.S.G. ch. 5, pt. A.

calculation of the sum of laundered funds attributable to him, namely, $ 2.7 million.[4]   Brown timely appealed from the district court's corresponding judgment.

## II.  DISCUSSION

Iossifov raises multiple challenges to his convictions, and both Defendants raise various challenges to their sentences.  The Court takes each Defendant's arguments in turn.

## A.  Iossifov's Venue, Jurisdiction, and Due Process Claims

Iossifov raises each of the arguments set forth in the motion to dismiss the superseding indictment filed by Defendant Nistor[5] before the district court, which include improper venue, impermissible extraterritorial application of 18 U.S.C. § 1962(d) and 18 U.S.C. § 1956(h), and a violation of due process.  This Court reviews a district court's ruling on a motion to dismiss an indictment *de novo*.  *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013).  We also review venue determinations *de novo*.  *United States v. Kuehne*, 547 F.3d 667, 677 (6th Cir. 2008).

### i.  Venue

Defendant Iossifov first argues that "the trial court misapplied the law in not dismissing for improper venue" because he did not engage "in any activities in the United States, let alone in the Eastern District of Kentucky."  (Iossifov Br. 15.)  The government counters that venue was proper because acts in furtherance of the conspiracy took place in the Eastern District of Kentucky.

The Constitution provides that the venue for a criminal prosecution must be the district where the crime was committed, and the government is required to establish venue by a preponderance of the evidence.  *See* U.S. Const. amend. VI; *United States v. Thomas*, 74 F.3d 701, 709 (6th Cir. 1996); *see also* Fed. R. Crim. Proc. 18.  To determine where the crime was

---

[4]By his own calculations, Brown's objections to the recommended sentencing enhancements (if sustained) would have reduced his offense level from 28 to 24.  This reduction, in turn, would have reduced the applicable guidelines range from 78–97 months to 51–63 months.  *See* Sent'g Table, U.S.S.G. ch. 5, pt. A.

[5]Iossifov did not originally join his co-conspirators' pretrial motion; however, the district court permitted him to later join the motion for the purpose of preserving the arguments for post-trial motions and/or appeals. The government did not contest that decision.

committed, courts look to "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 5 (1998) (quoting *United States v. Anderson*, 328 U.S. 669, 703 (1946)). As provided by 18 U.S.C. § 1956(i), venue for money laundering conspiracy is proper "in any . . . district where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2); *see also Whitfield v. United States*, 543 U.S. 209, 218 (2005) (concluding that 18 U.S.C. § 1956(i) "serves to supplement" the default venue rule under Rule 18); Fed. R. Crim. Proc. 18. Critically, a co-conspirator's acts need not be foreseeable to a defendant for venue to properly lie in the district where such acts took place, nor is it necessary for a co-conspirator to "have entered the district" where venue lies "so long as this standard is met." *See United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001) (citation omitted); *see also United States v. Castaneda*, 315 F. App'x 564, 569–70 (6th Cir. 2009).

In this case, the government presented substantial evidence that acts in furtherance of the money laundering conspiracy, which served as a predicate for Iossifov's RICO conspiracy conviction, occurred in the Eastern District of Kentucky. Indeed, the confidential source, who acted in furtherance of the scheme and laundered money under the government's supervision, was based in the district. Additionally, various victims were located in the Eastern District of Kentucky, in cities including Harlan and Lexington. Finally, in a written stipulation signed by both parties and read aloud by the district court during trial, Iossifov agreed that "[f]or purposes of all counts, . . . at least one of the acts in furtherance of every charged conspiracy took place in the Eastern District of Kentucky." (Trial Tr. Day 2, I.R. 1104, Page ID # 8221.) Iossifov did not object to the stipulation when it was read aloud by the district court.

Because the preponderance of the evidence shows that "an act in furtherance of the attempt or conspiracy took place" in the Eastern District of Kentucky, the district court's venue determination was proper. 18 U.S.C. § 1956(i)(2); *see also Whitfield*, 543 U.S. at 218.

### ii. Jurisdiction

Iossifov also claims that the district court "lacked extraterritorial jurisdiction to hold him responsible for the offenses of conviction." (Iossifov Br. 18–19.) While "[i]t is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the

world,'" the presumption against extraterritoriality may be rebutted where there is "clearly expressed congressional intent" that a statute applies to foreign conduct. *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)).

In *RJR Nabisco*, the Supreme Court set out a "two-step framework for analyzing extraterritoriality issues." *Id.* at 337. First, the Court must ask "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* "If the statute is not extraterritorial" pursuant to the first step, the Court must move on to step two. *Id.* At step two, the Court asks "whether the case involves a domestic application of the statute" by assessing the "focus" of the statute. *Id.* Where a criminal defendant is charged for foreign conduct under the RICO statute, the Court must determine whether "the predicate[] alleged . . . appl[ies] extraterritorially." *Id.* at 339.

Applying *RJR Nabisco*'s two-step framework to this case, Iossifov's prosecution did not involve an impermissible extraterritorial application of the money laundering and/or RICO statutes. *See* 18 U.S.C. §§ 1956(h), 1962(d). The parties agree that Iossifov's RICO predicate offense is money laundering. And the money laundering statute, 18 U.S.C. § 1956, provides the following:

> There is extraterritorial jurisdiction over the conduct prohibited by this section if—
>
> (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and
>
> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

18 U.S.C. § 1956(f). Under *RJR Nabisco*'s first step, it is thus clear that "the presumption against extraterritoriality has been rebutted . . . [because] the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc.*, 579 U.S. at 337. Indeed, the statute explicitly states that it applies to foreign citizens where the conduct in question occurs, at least "in part," in the United States. 18 U.S.C. § 1956(f)(1).

In this case, Defendant Iossifov was charged with conspiracy to launder money pursuant to 18 U.S.C. § 1956(h), meaning that the government was tasked with showing that he agreed to

participate in a scheme to conduct unlawful financial transactions. *United States v. Powell*, 847 F.3d 760, 781 (6th Cir. 2017) ("[T]o establish a money-laundering conspiracy 'the government must prove (1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy.'") (quoting *United States v. Prince*, 618 F.3d 551, 553–54 (6th Cir. 2010)); *see also* 18 U.S.C. §§ 1956(a), 1956(h). Accordingly, as long as AOAF Network conspiratorial conduct occurred in the United States, jurisdiction was proper here. *See* 18 U.S.C. § 1956(f); *RJR Nabisco, Inc.*, 579 U.S. at 337. The record contains a long list of such conduct. It shows that AOAF Network members that were in close contact with Iossifov targeted and communicated with victims located in the United States; accepted payments and fraudulently converted them to Bitcoin within the United States; laundered funds within the United States; and created false identifications to facilitate AOAF Network transactions within the United States. Consequently, Iossifov's prosecution does not violate the presumption against extraterritoriality. *RJR Nabisco, Inc.*, 579 U.S. at 337; 18 U.S.C. § 1956(f).

Iossifov is also incorrect in his contention that the money laundering statute does not criminalize his conduct because "Bitcoin is not currency" and "does not qualify as funds or a monetary instrument." (Iossifov Br. 21–22); *see generally* 18 U.S.C. § 1956(a). Iossifov's argument faces three main challenges.

First, the AOAF Network did not merely operate within the world of digital currencies; rather, it used digital exchanges as a means through which to launder fiat currency. Indeed, the network induced victims to buy gift cards, debit cards, and money with American dollars; converted those dollar amounts to Bitcoin; used exchanges to transfer the Bitcoin abroad; and later turned the Bitcoin back to cash. On either end of the scheme, the network laundered fiat currency.

Second, while the terms "monetary instrument" and "funds" are not defined within the money laundering statute, courts that have addressed this question have unanimously determined that Bitcoin falls under those terms. 18 U.S.C. § 1956; (Op. & Order Defs.' Mot. Dismiss, I.R. 574, Page ID # 4144, n.31); *see, e.g.*, *United States v. Ulbricht*, 31 F. Supp. 3d 540, 569–70 (S.D.N.Y. 2014) (concluding that Bitcoin falls within the purview of 18 U.S.C. § 1956); *United*

*States v. Decker*, 832 F. App'x 639, 650 n.7 (11th Cir. 2020)(acknowledging that "no court has adopted" the argument that Bitcoin is not covered by § 1956); *United States v. Budovsky*, No. 13-cr-368 DLC, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (finding that IRS guidance does "not suggest that the term 'funds' should not be read to encompass virtual currencies"); *see also United States v. Mansy*, No. 2:15-cr-198, 2017 WL 9672554, at *2 (D. Me. May 11, 2017) ("Defendants' most developed argument, that the IRS's treatment of virtual currency as 'property' means that virtual currency cannot be 'money' in other contexts, has been expressly and persuasively rejected by other courts."); *United States v. Murgio*, 209 F. Supp. 3d 698, 709 (S.D.N.Y. 2016) ("[T]he fact that the IRS treats virtual currency as 'property,' rather than 'currency,' for tax purposes is irrelevant to the inquiry here."); *Sec. & Exch. Comm'n v. Shavers,* No. 4:13-cv-416, 2014 WL 12622292, at *6 (E.D. Tex. Aug. 26, 2014) ("The Court finds no reason to conclude . . . that Bitcoin is not money.").

Third and finally, "[t]he ordinary meaning of 'funds[ ]' . . . is 'available pecuniary resources,'" which essentially means, "'something generally accepted as a medium of exchange, a measure of value, or a means of payment.'" *United States v. Stetkiew*, No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb. 1, 2019) (quoting *Murgio*, 209 F. Supp. 3d at 707); *see also Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (concluding that undefined statutory terms are given their "ordinary meaning"). Stated otherwise, the term "funds" encompasses any currency that can be used to pay for things. (*See* Op. & Order Defs.' Mot. Dismiss, I.R. 574, Page ID # 4145 (quoting *Ulbricht*, 31 F. Supp. 3d 540, 569–70 (S.D.N.Y. 2014)).) In today's society, Bitcoin is often used pay for things, and it may sometimes be used as a medium of exchange that is subsequently converted to currency to pay for things. For all of these reasons, Iossifov's contention that Bitcoin does not fall under the money laundering statute is unavailing.

### iii. Due Process

Iossifov also alleges that his due process rights were "violated by the trial court's improper[] finding that it had jurisdiction over his case." (Iossifov Br. 22.) The district court characterized this argument as "an as-applied [constitutional] challenge to 18 U.S.C. § 1956." (Op. & Order Defs.' Mot. Dismiss, I.R. 574, Page ID # 4145.)

Addressing this challenge, the district court stated that even "[a]ssuming that the Fifth Amendment limits Congressional authority to criminalize extraterritorial conduct," a conclusion that this Circuit has not explicitly adopted, Defendant's argument fails. (*Id.* at Page ID # 4145–46; *id.* at Page ID 4146 n.34.)   Indeed, it reasoned that Iossifov's prosecution was neither arbitrary nor fundamentally unfair because "the involved statutes clearly apply extraterritorially, and the government undoubtedly alleges domestic conduct, involvement of American citizens, as well as communications and transactions into and out of the United States." (*Id.* at Page ID # 4152); *see also United States v. Murillo*, 826 F.3d 152, 156 (4th Cir. 2016) (concluding that whether the enforcement of an extraterritorial statute comports with due process turns on fundamental fairness and an absence of arbitrariness); *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (concluding that due process calls for a sufficient nexus between the defendant and the United States); *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990) (concluding that "there must be a sufficient nexus between the defendant and the United States . . . so that [the extraterritorial application of a federal criminal statute] would not be arbitrary or fundamentally unfair").

We affirm the district court's conclusion.   The text of 18 U.S.C. § 1956 demonstrates Congress' clear and specific intent to provide for the extraterritorial application of the statute in cases like this one, where there is significant evidence that a defendant collaborated in a money laundering scheme that took place, at least in part, in the United States.   18 U.S.C. §§ 1956(f), 1956(h).   This is particularly true where the ties, or "nexus," between the charged offense and the United States are numerous and compelling. *Yousef*, 327 F.3d at 111.

In this case, the jury heard from co-conspirators closely tied to Iossifov who posted fraudulent advertisements luring American victims to pay large sums of money for nonexistent goods.   The jury also heard that Iossifov offered to help fraudsters secure additional false advertisements.   Finally, the jury heard about the various ways in which Iossifov facilitated the exchange of the proceeds stemming from these fraudulent transactions.   That "Iossifov is a Bulgarian citizen[] who had never set foot in the United States before his extradition" does not mitigate the fact that his conspiracy charges were grounded in conduct that was sufficiently tied to the United States. (Iossifov Br. 23.) Thus, even assuming that the Fifth Amendment limits

congressional authority to criminalize extraterritorial conduct, Iossifov's prosecution did not run afoul of those limits because it was not arbitrary or fundamentally unfair.

**B. Sufficiency of the Evidence for Iossifov's Convictions**

Defendant Iossifov challenges both of his convictions insofar as the government allegedly failed to show his guilty knowledge beyond a reasonable doubt. He contends that "there was no testimony upon which any rational trier of fact could conclude that Iossifov *knew* that the Bitcoin he was exchanging was derived from fraudulent activities." (*Id.* at 33 (emphasis added).) The Court reviews "*de novo* the sufficiency of the evidence to sustain a conviction." *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (quoting *United States v. Gunter*, 552 F.3d 472, 482 (6th Cir. 2009)) (internal quotations omitted). The Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 433 U.S. 307, 319 (1979)) (emphasis in original).

"Under Rule 29, notwithstanding the jury verdict, 'the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.'" *United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022) (quoting Fed. R. Crim. P. 29(a)). The Court assesses a defendant's challenge to the sufficiency of the evidence "against the elements of the charged crime," *Musacchio*, 577 U.S. at 239, and "a defendant claiming insufficiency of the evidence bears a very heavy burden," *Emmons*, 8 F.4th at 478 (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). Additionally, "[a]ll reasonable inferences must be made to support the jury verdict." *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017). "When considering the sufficiency of the evidence, we cannot 'reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury.'" *Sadler*, 24 F.4th at 539 (quoting *Emmons*, 8 F.4th at 478).

The Court first turns to the elements of the charged offenses. *See Musacchio*, 577 U.S. at 711. First, to convict a defendant of money laundering conspiracy under 18 U.S.C. § 1956(h), a jury must find that the defendant "agreed with another person to violate the substantive

provisions of the money laundering statute during the period alleged in the indictment." *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006).  The district court correctly instructed the jury that it could find Iossifov guilty under the money laundering statute if it determined Iossifov knew that the property involved in his financial transactions represented "the proceeds of some form of unlawful activity" and he had the intent to promote the continuation of that activity. 18 U.S.C. § 1956(a); (*see also* Trial Tr. Day 6, I.R. 1108, Page ID # 9143–47).  Second, to find a defendant guilty of RICO conspiracy under 18 U.S.C. § 1962(d), the jury must find that two or more individuals "agreed to participate in the conduct of an enterprise that would affect interstate or foreign commerce through a pattern of racketeering;" that the defendant knowingly joined that agreement; and "the defendant, or another member of the conspiracy, agreed to commit at least two acts of racketeering activity."  (Trial Tr. Day 6, I.R. 1108, Page ID # 9120); 18 U.S.C. §§ 1962(a)–(d); *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008).  Boiling down the two charges to the relevant elements on appeal, the government had to prove, beyond a reasonable doubt, that Iossifov knew that the transactions he agreed to engage in consisted of Bitcoin obtained through fraud.  *See Emmons*, 8 F.4th at 477–78.

Iossifov reiterates the claim that he "was not aware that the Romanian customers later charged with fraud were engaged in fraudulent activities until an arrest and extradition warrant was served on him at his home . . . ."  (Appellant's Br. at 32.)  But Iossifov's argument is belied by the direct and circumstantial evidence provided by the government at trial.  Indeed, Stoica testified that Iossifov knew that the large sums of Bitcoin that he and Sandu exchanged came from fraudulent transactions.  Stoica's testimony was bolstered by the government's exhibits showing that Iossifov knew that he was not following his own purported AML policies when he allowed the fraudsters to exchange large sums of Bitcoin for cash without providing an identification or proof of the source of the Bitcoin.  The testimony was further buttressed by emails demonstrating that Iossifov continued to transact with Sandu after Sandu asked RG Coins to provide him with cash in a "paper bag," refrain from checking his identification, and help him avoid being identified and questioned by the police.  (Trial Tr. Day 5, I.R. 1107, Page ID # 8968–71.)  And the government also provided the jury with an email exchange in which Iossifov confirmed that he was willing to go about these covert tactics with "no questions asked."  (Trial Tr. Day 4, I.R. 1106, Page ID # 8748.)

Additionally, and perhaps most critically, Iossifov testified at his trial, and he told the jury he had no knowledge that his Romanian customers were engaged in fraudulent activities. The jury weighed his testimony in the context of the rest of the evidence, and it chose not to believe Iossifov. The Court must give due deference to that decision. Indeed, because our analysis is limited to whether "a rational jury could have relied on [Iossifov's] testimony to conclude that [he] was aware" that the funds he exchanged came from fraudulent transactions, we cannot simply "reweigh the weight and credibility of [this] testimony" to reach the outcome that Iossifov proposes here. *Sadler*, 24 F.4th at 542 (emphasis added).

Viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences to support the conviction, the record thus provides sufficient evidence to uphold Iossifov's convictions.[6] *Emmons*, 8 F.4th at 478; *see generally* 18 U.S.C. §§ 1956(a), 1956(h), 1962(a)–(d).

## C. Iossifov's Evidentiary Objections

Iossifov argues that the district court erroneously admitted hearsay statements regarding Defendant Stoica's out-of-court conversation with Defendant Sandu. He also claims that the district court improperly allowed Marko Leopard to testify about "other acts" committed by Iossifov in regard to a different conspiracy network.

This Court "generally review[s] the district court's admission or exclusion of evidence for abuse of discretion." *Emmons*, 8 F.4th at 473 (quoting *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008)). Under this standard, the Court may find that "[a] district court . . . abused its discretion when its decision rests on the wrong legal standard, a misapplication of the correct standard, or on clearly erroneous facts." *United States v. Gibbs*, 797 F.3d 416, 422 (6th Cir. 2015) (citing *Yoder & Frey Auctioneers, Inc. v. EquimentFacts, LLC*, 774 F.3d 1065, 1070 (6th

---

[6]Iossifov argues that much of the evidence was "the testimony of co-defendants who had pled guilty and were seeking to reduce their punishment by testifying for the United States." (Iossifov Br. 33.) As indicated above, however, "[w]hen considering the sufficiency of the evidence, we cannot 'reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury.'" *Sadler*, 24 F.4th at 539 (quoting *Emmons*, 8 F.4th at 478 ). Given that standard and the fact that "[t]he jury heard those witnesses testify and was instructed to view their testimony with caution," this argument is unavailing. (Gov't Br. 30 (citing Trial Tr. Day 6, I.R. 1108, Page ID # 9154).)

Cir. 2014)). If evidence was erroneously admitted, the Court asks whether the admission was harmless error or otherwise requires reversal of a conviction. *United States v. Martinez*, 588 F.3d 301, 312 (6th Cir. 2009).

### i. Alleged Hearsay Statements

During Iossifov's trial, Defendant Stoica testified that Iossifov knew that some of the Bitcoin he exchanged in Bulgaria came from fraudulent sources. Stoica stated that Defendant Sandu had "discussed the fraud with Mr. Iossifov" and that Sandu said Iossifov could "put him in contact with someone that would be able to provide services," specifically, assistance in securing more fraudulent advertisements. (*See id.* at Page ID # 8454.) Stoica also stated that Sandu had described how the exchange process would work if Stoica used Iossifov's services: "he told me that I would—I would receive a password. I would send the bitcoins to RG Coins to Mr. Iossifov, and then I would receive a password. And with that password, I would be able to go in Sofia, Bulgaria at his exchange office to pick up the money." *Id.* Iossifov's counsel objected. He argued that because the government had not proved that there was indeed a conspiracy, the statements could not be admitted as co-conspirator statements under Rule 801(d)(2)(E). On appeal, Iossifov reiterates his objection and contends that Sandu's statements amount to hearsay because they were not made in furtherance of the AOFN Network scheme.

Rule 801(d)(2)(E) sets out that a statement "offered against an opposing party" is not hearsay if the statement "was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Accordingly, to admit co-conspirator statements under Rule 801(d)(2)(E), courts must find that: (1) there was a conspiracy; (2) the defendant was a member of that conspiracy; and (3) the co-conspirator made the statement in furtherance of the conspiracy. *United States v. Young*, 847 F.3d 328, 352 (6th Cir. 2017); *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009).

The district court properly admitted Stoica's statements regarding his out-of-court conversation with Sandu. On appeal, Iossifov tethers his argument to the third element of the Rule 801(d)(2)(E) framework, namely, whether the co-conspirator's out-of-court statement was made in furtherance of the conspiracy. *Young*, 847 F.3d at 352. He contends that Stoica's

testimony referenced Sandu's "casual conversation," rather than any statements actually made in furtherance of the conspiracy. (Iossifov Br. 26); *Young*, 847 F.3d at 352. But the record shows otherwise. Indeed, Sandu provided Stoica with information about Iossifov's services, even describing how the services would work, specifically so that Sandu could safely cash out the Bitcoin that Stoica had illegally procured. *See United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007) (concluding that a co-conspirator's statements made "with the intention of reassuring [an undercover agent] of [Defendant]'s reliability as a supplier" were made in furtherance of the conspiracy); *United States v. Hitow*, 889 F.2d 1573, 1581–82 (6th Cir. 1989) (concluding that statements were in furtherance of a conspiracy when they "identified [a co-conspirator]'s participation and role in the conspiracy, . . . informed [the listener] as to the activity and status of the conspiracy," and informed the listener about potential customers). Sandu's out-of-court statements were thus properly admitted under Rule 801(d)(2)(E). *See Young*, 847 F.3d at 352; Fed. R. Evid. 801(d)(2)(E).

### ii. "Other Acts" Evidence

Ahead of and at trial, Iossifov objected to the admission of Marko Leopard's testimony about Iossifov's alleged involvement with a separate internet fraud network, Infraud, on the grounds that it was not permissible "other act" evidence under Rule 404(a). The district court denied his motion. It reasoned that Leopard's proposed testimony was probative of at least one "Rule 404(b) non-character admission predicate," including "plan, knowledge," and "absence of mistake," and its admission was more probative than prejudicial. (Order Mot. in Lim., I.R. 858, Page ID # 5302–07; Trial Tr. Day 4, I.R. 1106, Page ID # 8524–25); Fed. R. Evid. 404(b)(2), 403. On appeal, Iossifov maintains that the evidence "should not have been admitted because it bears no relationship to the charges at issue in the Indictment and it unduly prejudiced Iossifov."[7] (Iossifov Br. 28.)

---

[7]As he did in his pretrial motion in limine, Iossifov argues, *verbatim*, that the government intended to use Leopard's testimony as *res gestae* "intrinsic" or "background" evidence, which is a narrow exception that would fall outside any permitted uses provided by Rule 404(b). *See Sadler*, 24 F.4th at 554; *United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013); (Iossifov Br. 28; *see also* Resp. to Notice of Intent to Use Evid. of Bad Acts, I.R. 776, Page ID # 4876–77). The district court declined to address this argument because the government explicitly "disclaimed that theory." (Order Mot. in Lim., I.R. 858, Page ID # 5299 n.3; *see also* Resp. to Mot. in Lim, I.R. 780, Page ID # 4891 n.1 ("Contrary to Iossifov's reading of the notice, the government does not seek to admit this

Under Rule 404(b), courts may admit evidence of "other crimes, wrongs, or acts," where it is admitted for a purpose other than proving "a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). Permissible uses include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* This Court has set out a three-part framework for evaluating this exception. *See United States v. Lattner*, 385 F.3d 947, 955 (6th Cir. 2004). First, courts must determine whether there "sufficient evidence that the 'other acts' took place." *Id.* Second, they must ask "whether those 'other acts' are admissible for a proper purpose under Rule 404(b)." *Id.* Third and finally, courts must determine "whether the 'other acts' evidence is more prejudicial than probative." *Id.* (citing *United States v. Mack*, 258 F.3d 548, 533 (6th Cir. 2001)). Each of these steps comes with its own standard of review by this Court: We review "the district court's determination that the 'other act' took place" for clear error; "the district court's legal determination that the evidence was admissible for a proper purpose" *de novo*; and "the district court's determination that the probative value of the other-acts evidence is not substantially outweighed by its unfairly prejudicial effect" for an abuse of discretion. *Id.* (quoting *United States v. Ayoub*, 498 F.3d 532, 547 (6th Cir. 2007)) (internal quotations omitted).

In the instant case, the district court did not clearly err when it determined that there was sufficient evidence that the transactions and conversations described by Marko Leopard took place. *Emmons*, 8 F.4th at 473; *Lattner*, 385 F.3d at 955. Indeed, the government provided direct evidence of the interactions between Iossifov and Leopard. At trial, it introduced various emails concerning the exchange of large sums of Bitcoin as well as a VIP Card that Iossifov gave Leopard to use at RG Coins in order to receive special discounts. Iossifov's counsel did not object to the admission of this evidence. The district court did not clearly err when it determined that there was sufficient evidence regarding the occurrence of the "other acts" to which Leopard testified. *Emmons*, 8 F.4th at 473; *Lattner*, 385 F.3d at 955.

---

evidence as *res gestae* evidence.").) While Iossifov renewed his objection to the evidence on Rule 404(b) grounds at trial, he did not reiterate the *res gestae* claim, possibly because the government did not, in fact, introduce the evidence as background or intrinsic evidence during his trial. We thus center our analysis around Iossifov's Rule 404(b) claim.

Furthermore, reviewing part two of the Rule 404(b) inquiry *de novo*, the district court correctly found that Leopard's testimony discussed "other acts" covered by the permissible purposes laid out in Rule 404(b)(2). *Emmons*, 8 F.4th at 473; *Lattner*, 385 F.3d at 955; Fed. R. Evid. 404(b)(2). Iossifov maintains that "the Government's *only* real purpose of [sic] admitting this evidence was to malign the character of Iossifov and suggest his propensity to commit fraud, which is impermissible." (Iossifov Br. 30 (emphasis in original).) But the record shows otherwise. Indeed, Iossifov himself maintains that a central issue in this case is whether "Iossifov *knowingly* participated in the offenses charged," specifically AOAFN Network's fraudulent money laundering scheme. (Iossifov Br. 31–32 (emphasis added).) And as the district court noted both in its preliminary ruling and trial, Leopard's testimony shed direct light upon Iossifov's understanding and conscious knowledge that his business participated in the exchange of fraudulent Bitcoin. This is a permitted purpose under Rule 404(b)(2). *See* Fed. R. Evid. 404(b)(2); *cf. United States v. Lash*, 937 F.2d 1077, 1087 (6th Cir. 1991).

Finally, the district court did not abuse its discretion when it concluded that Leopard's testimony was more probative than prejudicial. *Emmons*, 8 F.4th at 473; *Lattner*, 385 F.3d at 955. The district court acknowledged that "there's some prejudice involved," but it ultimately determined that "I don't think it's unfair prejudice . . . and I certainly don't think that the danger of that substantially outweighs the probative value." (Trial Tr. Day 4, I.R. 1106, Page ID # 8525); *see* Fed. R. Evid. 403. In doing so, the court reasoned that the testimony "contributed to the understanding of Mr. Iossifov's business design" and "the way he operated," including "the lack of [anti-money laundering practices]" in place and the various ways in which Iossifov consciously "ma[de] it easy" for fraudsters to launder money. (*Id.* at Page ID # 8524–25.) Considering all the evidence bolstering the fraudulent nature of Iossifov's practices, the district court's "strong cautionary instruction about the limited permissible use of the other acts evidence" during trial, and that "no facts exist to show why this evidence should be seen as more prejudicial than the evidence presented in similar cases," the district court did not abuse its discretion.[8] *Lattner*, 385 F.3d at 958; (Trial Tr. Day 4, I.R. 1106, Page ID # 8526–27 ("If you

---

[8]The only case that Iossifov cites for the proposition that Leopard's testimony was more prejudicial than probative is a 2013 district court case that is readily distinguishable. *See United States v. Javidan*, No. 11-cr-20052, 2013 WL 1563212, at *1–7 (E.D. Mich. Apr. 15, 2013). In that case, the court found that the "other acts" evidence

find that the defendant did those acts, you can consider the evidence only as it relates to the government's claim concerning the defendant's intent, preparation, plan, knowledge, or absence of mistake as to the issues in this case. You must not consider it for any other purpose. Remember that the defendant is on trial here only for the crimes charged in the indictment, not for the other acts.")). Accordingly, the district court did not err in admitting Leopard's testimony under Rule 404(b).

**D. Iossifov's Newly Discovered Evidence Claim**

Following Iossifov's trial and pursuant to its obligations under *Brady v. Maryland* and *Giglio v. United States*, the government provided Iossifov's counsel with information regarding possible misrepresentations that witness Marko Leopard may have made in preparation for his sentencing hearing. *See Brady v. Maryland*, 373 U.S. 83, 90 (1963); *Giglio v. United States*, 405 U.S. 150, 153–55 (1972). Iossifov subsequently filed a motion for a new trial based on newly discovered evidence.

The Court reviews for abuse of discretion a district court's order on a Rule 33 motion for a new trial. *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012). We may conclude that the district court "abused its discretion when its decision rests on the wrong legal standard, a misapplication of the correct standard, or on clearly erroneous facts." *Gibbs*, 797 F.3d at 422 (quoting *Yoder*, 774 F.3d at 1070). "To prevail on a motion for a new trial based on newly discovered evidence, 'a defendant must show that the new evidence (1) was discovered after the trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal.'" *Sypher*, 684 F.3d at 626 (citing *United States v. Hanna*, 661 F.3d 271, 297 (6th Cir. 2011)). "[T]he court may vacate the judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a)

In this case, the newly discovered evidence showed that that Leopard may have lied about his Bitcoin assets when he was questioned by the probation department during the

___

that the government sought to introduce was prejudicial because the government had already offered similar "other acts" evidence from two other sources. *Id.* at *1. In contrast, the government here did not seek to admit the "cumulative" testimony of Iossifov's dealings with multiple fraud schemes beyond the AOAF Network. *Id.* Instead, it offered Leopard's testimony as the only outside evidence showing Iossifov's knowledge. Accordingly, Iossifov's analogy fails here.

preparation of his Presentence Investigation Report. While Leopard stated that he had no assets, the investigation uncovered that Leopard's former account contained approximately $6 million in Bitcoin and the corresponding address had engaged in several transactions in late 2020 and early 2021. The government thereafter asked Leopard about the account. He stated that he had no knowledge of the funds or the transactions, and he claimed that a friend had access to his former address. Neither the government nor the district court confirmed the veracity of Leopard's explanation.

Characterizing the government's disclosure letter, Iossifov claims that "it had been *determined* that Leopard had surreptitiously continued to be involved in attempting to launder ill-gotten gains" and that the "government *determined* that Leopard provided false information during his presentence investigation interview."**9** (Iossifov Br. 38 (emphasis added).) Accordingly, he argues that "Iossifov would likely have been acquitted if he would have been able to impeach Leopard" because "Leopard's testimony was highly likely to have been instrumental in acquitting Iossifov." (*Id.* at 39.) As it did before the district court, the government maintains that the impeachment evidence did not undermine the substance of Leopard's testimony, was merely cumulative and/or impeaching, and would not have resulted in Iossifov's acquittal.

The district court found, and the government does not dispute, that the impeachment evidence against Marko Leopard was discovered after trial and could not have otherwise been uncovered earlier. Because the information only became available in early 2021, months after Iossifov's trial, those findings were not erroneous. Accordingly, the Court's inquiry turns on factors three and four of the test laid out in *Sypher*, namely, whether the evidence is material and not merely cumulative or impeaching, and whether it would likely produce an acquittal if Iossifov were retried. *Sypher*, 684 F.3d at 626. As to those factors, the district court determined that "[c]onsidering Leopard's already known and plain credibility issues, as a convicted fraudster awaiting sentencing under a cooperation agreement, it is unlikely that this new information would have made a significant difference to the jury's evaluation of Leopard's testimony."

---

**9**The Court has not received any indication that Leopard's alleged misrepresentations have been confirmed, corroborated, or otherwise adjudicated in any way.

(Order Den. Mot. for New Tr., I.R. 1147, Page ID # 9363.)  It emphasized "the [limited] place of Leopard in the proof constellation" and concluded that, "even if the new information were to lead the jury to wholly discount Leopard's credibility, it is still not likely that the jury would have acquitted Iossifov" given that "Leopard's testimony was but a small, confirmatory piece of the vast puzzle."  (*Id.* at Page ID # 9363–64 (citing *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005)).)

The district court's conclusion did not amount to an abuse of discretion.  As to factor three, the evidence, by definition, is cumulative and impeaching.  *Sypher*, 684 F.3d at 626; *see also Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) ("[W]here the . . . evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already shown to be questionable . . . , the . . . evidence may be cumulative, and hence not material."); *Robinson v. Mils*, 592 F.3d 730, 736 (6th Cir. 2010).  Indeed, the government's March 2021 letter contained information related solely to Leopard's credibility as a witness.  And at trial, Leopard testified that he had pleaded guilty in a separate international fraud scheme, entered into a cooperation agreement with the government, and had yet to be sentenced at the time of his testimony.  Accordingly, the new evidence provided after trial "merely furnished[d] an additional basis on which to challenge" Leopard's trustworthiness.  *Collins*, 209 F.3d at 518.  Viewed in isolation, the evidence may have been material insofar as it qualified Leopard's statements in regard to Iossifov's guilty mind.  But considering it in the context of all the other evidence presented to the jury, the district court correctly determined that it was cumulative and impeaching.

Moreover, it is not likely that the newly discovered evidence would produce an acquittal if Iossifov received a new trial.  *Sypher*, 684 F.3d at 626.  Indeed, even if the evidence increasingly undermined Leopard's credibility, the government produced direct evidence that corroborated Leopard's substantive testimony about Iossifov and his business practices through RG Coins.  In regard to Leopard's statements that Iossifov provided Leopard with special discounts via a discount card, the government produced both a photograph of the card and the card itself.  Iossifov did not object to their introduction. The government also introduced emails between Iossifov and Leopard showing that Iossifov exchanged 20,000 euros worth of Leopard's

Bitcoin into cash. The emails also indicated that Leopard transacted through an intermediary, and that the intermediary would not wait for "confirmations" affirming the validity of the transactions. (Trial Tr. Day 4, I.R. 1106, Page ID # 8518–19.) Iossifov's counsel did not object to the introduction of these emails.

Finally, even if the new evidence completely undermined Leopard's testimony, it is likely that the jury would have still convicted Iossifov. Indeed, as the district court put it, Leopard's testimony was only a "small, confirmatory piece of the vast puzzle" of evidence. (Order Den. Mot. for New Tr., I.R. 1147, Page ID # 9363–64.) Multiple co-conspirators testified to the subversive practices that Leopard described in his testimony, including Iossifov's exchange of large sums of Bitcoin to cash, Iossifov's sanctioned use of intermediaries, his failure to follow anti-money laundering procedures, and his "no questions asked" operation. (Trial Tr. Day 4, I.R. 1106, Page ID # 8748; *see also* Trial Tr. Day 3, I.R. 1105, Page ID # 8274–85; Trial Tr. Day 5, I.R. 1107, Page ID # 8968–72.) For all these reasons, the district court did not abuse its discretion when it denied Iossifov's motion for a new trial.

## E. Iossifov's Sentencing Objections

On appeal, Defendant Iossifov raises two sentencing objections. He first argues that the district court erroneously imposed a two-level enhancement for obstruction of justice. Iossifov also contends that the court erred when it calculated the amount of laundered funds attributable to him, which allegedly caused the district court to erroneously impose an 18-level enhancement rather than a 16-level enhancement in light of the loss amount. Accordingly, Iossifov claims that his total offense level should have been 28 rather than 32, which would have reduced his sentencing range from 121–151 months to 78–97 months. *See* Sent'g Table, U.S.S.G. ch. 5, pt. A.

The Court reviews for clear error the district court's factual findings underlying sentencing enhancements. *See United States v. McGahee*, 257 F.3d 520, 534 (6th Cir. 2001); *United States v. Robinson*, 813 F.3d 251, 262 (6th Cir. 2016). This standard applies to factual findings related to loss amount calculations for money laundering and obstruction of justice. *Id.*; *see also* U.S.S.G. §§ 2B1.1(b)(1)(J), 3C1.1. However, "[w]hether conduct constitutes

obstruction of justice under Guidelines § 3C1.1 is reviewed *de novo*," given that it is a mixed question of law and fact. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (internal citation omitted); *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009).

### i. Obstruction of Justice Enhancement, U.S.S.G. § 3C1.1

Ahead of sentencing, the probation department recommended that the district court increase Iossifov's base offense level by two points for obstruction of justice. In support of the recommendation, the probation department argued that Iossifov committed perjury when he testified that his business did not have a ProtonMail account, which is the encrypted platform through which he exchanged emails with the AOAF Network co-conspirators. It also stated that Iossifov lied when he said that he asked for his clients' identification during his business transactions.[10] The district court imposed the enhancement due to its determination that Iossifov's testimony about the email platform and his identification practices was indeed false.

Sentencing Guidelines § 3C1.1 provides that a defendant's offense level should be increased by two levels where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing . . . and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The commentary adds that the obstructive conduct "can vary widely in nature, degree of planning, and seriousness," and it lists "committing . . . perjury" as well as "providing materially false information" under the examples of covered conduct. *Id.* cmt. 3, 4. The government bears the burden of proving by a preponderance of the evidence that the enhancement applies. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002) (citing *United States v. Parrott*, 148 F.3d 629, 635 (6th Cir. 1998)).

The district court's determination that Iossifov provided false testimony was not clearly erroneous. *See McGahee*, 257 F.3d at 534. While it is true that "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice," the court's determination that Iossifov lied was not "against the clear weight of the evidence." U.S.S.G. § 3C1.1 cmt. 2; *United*

---

[10]The probation department also concluded that Iossifov lied about his knowledge regarding a password for his Dropbox account, but the district court determined that the enhancement was not justified on that basis.

*States v. Dubrule*, 822 F.3d 866, 875 (6th Cir. 2016) (quoting *United States v. Grubbs*, 773 F.3d 726, 731 (6th Cir. 2014)).   Indeed, in regard to the email platform determination, the trial transcript shows that Iossifov first stated that "the company," RG Coins, did not have an email account on Proton,  (Trial Tr. Day 5, I.R. 1107, Page ID # 8932), but when he was confronted with an email that came from "rgcoins@ProtonMail.com," he backtracked and stated that "I haven't ever said that I don't have a business account in [sic] Proton," (*id.* at Page ID # 8964). Additionally, Iossifov testified that he asked the Romanian fraudsters for identification and that any testimony to the contrary was a lie—an allegation contrary to the consistent testimony of his co-conspirators and the email exhibits presented at trial.  Accordingly, the district court's factual conclusion that Iossifov lied on the stand was in accord with the "clear weight of the evidence." *Dubrule*, 822 F.3d at 875.

Importantly, the district court recognized that English is not Iossifov's first language, so his inaccurate statements could have—in theory—been attributed to language barriers rather than "a willful attempt to obstruct justice."  U.S.S.G. § 3C1.1 cmt. 2; (Iossifov Sent'g Tr., I.R. 1074, Page ID # 7107).  However, the court noted that it had "carefully looked and thought about the issue of [language]," considered the presence and efficacy of the interpretation, and evaluated Iossifov's broader testimony and demeanor for truthfulness and accuracy.  (*Id.* at Page ID # 7107–08.)   After doing so, the district court nevertheless concluded that Iossifov did, in fact, provide false testimony and did not merely fall victim to language barriers.  And "[u]nder the clearly erroneous standard," even "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.  *United States v. Demjanjuk*, 367 F.3d 623, 629 (6th Cir. 2004) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)) (internal quotations omitted).  That is true even when the district court's findings do not rest on credibility determinations.  *See id.*

In light of these findings and considerations, the district court did not err when it determined that Iossifov's false testimony was material and thus amounted to obstruction of justice.  *See Donadeo*, 910 F.3d at 893.  Iossifov's misrepresentations went directly to the merits of his charged offenses insofar as the statements shed light on his knowledge about the fraudsters' illegal conduct and his own subversive online practices.  *See* U.S.S.G. § 3C1.1 cmt. 1,

3.  The false testimony had the capacity to unduly sway the jury as to both the RICO and money laundering conspiracy charges.  *See* 18 U.S.C. §§ 1962(d), 1956(h).  Accordingly, the two-level enhancement was not erroneously applied to Iossifov's offense level.  *See generally* U.S.S.G. § 3C1.1 cmt. 1–4.

### ii.  Attributable Loss Amount Enhancement, U.S.S.G. § 2B1.1(b)(J)

In addition to the obstruction of justice enhancement, Iossifov's Presentence Investigation Report recommended that the district court increase his base offense by 18 levels due to the amount of laundered funds attributable to him.  *See* U.S.S.G. § 2B1.1(b)(J) (increasing base offense level by 18 points where the loss is greater than $3,500,000).  The probation department calculated the loss amount as $3.5 million to $9.5 million.  Relying in part on the Presentence Investigation Report over Iossifov's objection, the district court calculated the amount to be approximately $4.9 million.[11]

"In determining the amount of loss attributable to a defendant pursuant to Guidelines § 2B1.1(b), the district court may consider any 'relevant conduct.'" *Donadeo*, 910 F.3d at 894 (citing *United States v. Hodge*, 805 F.3d 675, 678–79 (6th Cir. 2015)).  Relevant conduct includes, but is not limited to:

(A)  all [criminal] acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant, and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

   (i) within the scope of the jointly undertaken criminal activity,

   (ii) in furtherance of that criminal activity, and

   (iii) reasonably foreseeable in connection with that criminal activity;

---

[11]In his sentencing memorandum, Iossifov argued that "it cannot be proven that the loss exceeds $3,500,000." (Iossifov Sent'g Mem., I.R. 1040, Page ID # 6602.)  He claimed that "[i]f an accurate analysis of the transactions is conducted, the loss amount of Bitcoins sold by the co-defendants is no more than $1,853,229.00." (*Id.* Page ID # 6603.)  However, Iossifov neither provided an explanation as to how he arrived at that figure, nor did he explain why it more accurately reflected the loss amount attributable to him.

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1); *Donadeo*, 910 F.3d at 894 (citing *Hodge*, 805 F.3d at 678–79). Additionally, the application notes to U.S.S.G. § 2B1.1(b) emphasize that "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss ... [and so] the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1(b) cmt. 3(C); *see also* 18 U.S.C. §§ 3742(e)–(f). The government must prove the loss amount attributable to a defendant by a preponderance of the evidence. *See United States v. Conatser*, 514 F.3d 508, 528 (6th Cir. 2008) (citing *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006)).

In this case, the district court included as relevant conduct the transactions carried out by four of Iossifov's co-defendants, including Sandu, Ologeanu, Cucu, and Popescu.[12] (Iossifov Sent'g Tr., I.R. 1074, Page ID # 7115.) It determined that each of them was directly tied to Iossifov. (*Id.* at Page ID # 7114.) As indicated by the chart below, the district court then adopted the Secret Service's calculation of the funds transacted by those four individuals through RG Coins between 2015 and 2017, which amounted to approximately $4.98 million. (Iossifov Sent'g Tr., I.R. 1074, Page ID # 7116; Gov't Calcs., I.R. 1034-2, Ex. 141, Page ID # 6551–2.)

| username | Bitcoin sold | ~USD value | Profit % | ~Profit |
|---|---|---|---|---|
| Catalin2016 | 1575.85502 | $671,803.16 | 4.00% | $26,872.13 |
| Ekathy2033 | 6238.17 | $2,833,976.79 | 3.50% | $99,189.19 |
| Marian Bradisteanu | 3183.931162 | $1,210,802.22 | 4.00% | $48,432.09 |
| Treaba2013 | 1073.49989 | $259,283.83 | 4.00% | $10,371.35 |
| | | | | |
| **Totals** | **12071.45607** | **$4,975,866.00** | | **$184,864.76** |
| | | | | |
| *Transactions conducted between 3/15 -12/17.* | | | | |

---

[12]Each of these co-conspirators used aliases which are noted in the spreadsheet submitted by the government. The aliases were associated with the listed individuals during trial and at Iossifov's sentencing hearing. "Catalin2016" was linked to Cucu; "Ekathy2033" was linked to Sandu, "Marian Bradisteanu" was linked to Ologeanu; and "Traeba2013" was linked to Popescu. (Iossifov Sent'g Tr., I.R. 1074, Page ID # 7048–49; *see also* Trial Tr. Day 3, I.R. 1105, Page ID # 8451 (linking "Ekathy2033" to Sandu); Trial Tr. Day 3, Page ID # 8419–20 (linking "Catalin2016" to Cucu); Trial Tr. Day 5, I.R. 1107, Page ID # 8989 (same); Trial Tr. Day 3, I.R. 1105, Page ID # 8252, 8274 (linking "Marian Bradisteanu" to Ologeanu); Trial Tr. Day 4, I.R. 1106, Page ID # 8768 (same); Trial Tr. Day 3, I.R. 1105, Page ID # 8344–55 (linking "Traeba2013" to Popescu).)

(Gov't Calcs., I.R. 1034-2, Ex. 141, Page ID # 6551.) The court specifically noted that the Secret Service investigation's methodology was "very strong in terms of its reliability," and it addressed Iossifov's objections to the calculation. (Iossifov Sent'g Tr., I.R. 1074, Page ID # 7116–18.) It determined that even if it credited Iossifov's arguments about the Bitcoin price-point used in the calculations, it would merely "take the total from 4.9 down to about 4.7, no difference at all, really, on the scope of what is involved." (*Id.* at Page ID # 7119.) Notably, although Iossifov claimed that the government's calculation was inaccurate, he did not present any argumentation or evidence tending to support that allegation. Nor did Iossifov do so before this Court; instead, he merely restated the argument that the government's calculations were inaccurate.[13]

Because the district court's calculation of the laundered funds attributable to Iossifov was not clearly erroneous, the Court finds no error in the 18-level enhancement assigned under U.S.S.G. § 2B1.1(b)(J).

**F. Brown's Sentencing Objections**

On appeal, Defendant Brown argues that the district court erroneously imposed a two-level enhancement for obstruction of justice. He also contends that the court erred when it calculated the amount of laundered funds attributable to him, which allegedly caused the district court to erroneously impose a 16-level rather than a 14-level adjustment in light of the loss amount. Accordingly, Brown argues that his total offense level should have been 24 rather than 28, which would have reduced his sentencing range from 78–97 months to 51–63 months. *See* Sent'g Table, U.S.S.G. ch. 5, pt. A.

**i. Obstruction of Justice Enhancement, U.S.S.G § 3C1.1**

Prior to Brown's sentencing hearing, the government recommended that Brown's total offense level include a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. It argued the following:

---

[13]Notably, while Iossifov continues to contend that the spreadsheets submitted by the United States "do not indicate the Bitcoin addresses of the sender and recipient of the Bitcoins" and are thus allegedly unreliable, he excludes Exhibit 141, which calculates the loss amount to $4.98 million, from that list. (Iossifov Br. 34 (mentioning United States Ex. 137A, 138A, 140A, 139A); *see also* Gov't Calcs., I.R. 1034-2, Ex. 141, Page ID # 6551.)

Specifically, the United States asserts that the defendant attempted to impede his prosecution by, either directly or indirectly, sending the presiding judge, lead prosecutor, and Clerk of the Court, among potentially others, false tax filings stating that each party owed a substantial amount of money (millions of dollars) to the defendant. The United States argues that this conduct occurred the week before trial was set to commence and was an attempt to delay and intimidate pursuant to USSG § 3C1.1, Application Note 4(A).

(Add. to Brown PSR, R. 1090, Page ID # 7276–77.) Brown objected and claimed that the government's obstruction of justice argument was "precluded by the plea agreement, in which the United States and the defendant submitted a joint guideline calculation, which did not reserve the issue of whether the defendant obstructed justice."[14] (*Id.* at Page ID # 7277.) The district court determined that the plea agreement did not foreclose the government's argument, *see* U.S.S.G. § 6B1.4, and it concluded that there was "plenty of proof" that Brown either sent or orchestrated the sending of the false IRS forms in order to "disrupt and distract and perhaps delay the proceedings," (Brown Sent'g Tr., B.R. 1092, Page ID # 7432–7435) (referencing U.S.S.G. § 3C1.1 cmt. 4(A)).

As noted above, U.S.S.G. § 3C1.1 provides that a defendant's offense level should be increased by two levels where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing . . . and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relative conduct." The obstructive conduct "can vary widely in nature," *see* U.S.S.G. § 3C1.1 cmt. 3, and the government must only prove the conduct by a preponderance of the evidence, *Dunham*, 295 F.3d at 609.

In this case, the district court did not clearly err when it concluded that, by the preponderance of the evidence, Brown sent or orchestrated the sending of the false IRS forms weeks before his scheduled trial. *Dunham*, 295 F.3d at 609. The false IRS forms, postmarked in late August 2020 when Brown was out of jail on bond, included Brown's full name, P.O. Box address, and Taxpayer Identification Number. The court emphasized that "the people he sent

---

[14]Notably, the plea agreement stated that "Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend the following sentencing guidelines calculations [which did not include the obstruction of justice offense variable], and they *may object to or argue in favor of other calculations*." (Brown Plea Agreement, B.R. 856, Page ID # 5289 (emphasis added).)

[the forms] to," including Judge Wier, AUSA Anderson, and CJA Attorney Walton, were key players in Brown's case, and "it would take some, you know, significant case familiarity" to know to send the forms to those individuals. (Brown Sent'g Tr., B.R. 1092, Page ID # 7432–33.)

Given these circumstances, the district court did not erroneously impose the obstruction of justice enhancement. Sending the false IRS forms fell under the umbrella of examples of conduct covered by the enhancement, namely, "threatening, intimidating, or otherwise unlawfully influencing, a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. 4(A). While Brown contends that the conduct attributed to him does not "directly" correspond with the examples laid out by the guideline's application notes, (Brown Br. 12–15), the application notes themselves make clear that "this is a *non-exhaustive list* of examples of the *types of conduct* to which the adjustment applies," U.S.S.G. § 3C1.1 cmt. 4 (emphasis added). And as the district court noted, the question is whether "the attempt" to obstruct justice "has been made, not whether it succeeded." (Brown Sent'g Tr., B.R. 1092, Page ID # 7434.) Accordingly, Brown's argument that the "conduct had no effect on the actual proceedings" is also unavailing. (Brown Br. 14.) We thus find the two-level enhancement for obstruction of justice was not erroneously applied. *See generally* U.S.S.G. § 3C1.1.

### ii. Attributable Loss Amount Enhancement, U.S.S.G. § 2B1.1(b)(1)(I)

The probation department also recommended that the district court increase Brown's base offense level by 16 points due to the loss attributable to him, namely, more than $1.5 million but less than $3 million. Brown objected on the grounds that, pursuant to his plea agreement, he had only agreed that "he laundered or attempted to launder" $664,460. (Add. to Brown PSR, B.R. 1090, Page ID # 7278.) He claimed that the relevant conduct for consideration did not include "the activities of other 'domestic processors,' charged or uncharged" because it "would not constitute relevant conduct in jointly undertaken criminal activity." (*Id.*)

The district court adopted the probation department's recommendation on the basis that, pursuant to the *Donadeo* factors, the loss amount included funds attributable to the broader fraud scheme that Brown voluntarily joined. *See generally Donadeo*, 910 F.3d at 896–98 (setting out the relevant factors for evaluating the breadth of joint criminal activities, including "the existence

of a single scheme," "similarities in modus operandi," "coordination of activities among schemers," "pooling of resources or profits," "knowledge of the scope of the scheme," and "length and degree of the defendant's participation in the scheme"). The court specifically defined the scope of the joint enterprise, established Brown's role within it, and included in its calculation the laundered funds that were the product of "full jointly undertaken criminal activity" within the Eastern District of Kentucky. (Brown Sent'g Tr., B.R. 1092, Page ID # 7421–30.) That amount was approximately $2.74 million.

As previously noted, "the district court may consider any 'relevant conduct.'" *Donadeo*, 910 F.3d at 894 (citing *Hodge*, 805 F.3d at 678–79). Relevant conduct includes "all [criminal] acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," the acts and omissions of others. *See* U.S.S.G. § 1B1.3(a)(1); *Donadeo*, 910 F.3d at 894 (citing *Hodge*, 805 F.3d at 678–79). The government must prove the amount by a preponderance of the evidence. *Conatser*, 514 F.3d at 528.

The district court did not clearly err when it determined that the government proved the $2.74 million loss amount attributable to Brown by a preponderance of the evidence. *Conatser*, 514 F.3d at 528. The district court analyzed the *Donadeo* factors and determined that the evidence showed that there was one overarching enterprise that had an "overall goal" to launder funds that were fraudulently taken from American victims. (Brown Sent'g Tr., B.R. 1092, Page ID # 7423–26.) While the district court credited Brown's assertion that "the defendant himself laundered or attempted to launder" only $664,000 worth of proceeds "during the March 2015 to March 2017 period," (Brown Sent'g Tr., B.R. 1092, Page ID # 7419), the court nevertheless added the $2.1 million attributable to other co-conspirators in the Eastern District of Kentucky given the fact that Brown pleaded guilty to conspiring to commit a RICO offense under 18 U.S.C. § 1962(d). This determination was supported by facts that Brown stipulated to in his plea agreement, namely, that he entered into a voluntary agreement to convert fraudulent funds, which came from "online auction fraud . . . [that] he knew involved other U.S.-based co-conspirators." (Brown Plea Agreement, B.R. 856, Page ID # 5288; *see also* Brown Reply Br.

("Mr. Brown does not deny that he was told by the confidential witness that other people were involved in the scheme.").)  The court supported its reasoning with undisputed facts, such as Brown's admission that he created fake IDs for multiple fraudsters that he did not directly know or work with.

In his opening brief, Brown incorrectly stated that "the district court included the entire conspiracy" when it assessed "the scope of the jointly undertaken criminal activity in this case." (Brown Br. 18; *see also* Brown Reply Br. 2 ("The Government correctly notes that counsel incorrectly stated that Mr. Brown was held accountable for the loss of the entire conspiracy.").) To the contrary, the court limited its calculations to the value of the laundered funds "relative to the AOAF conspirators charged in this district," which did not, in fact, include "the entire conspiracy."  (Brown Sent'g Tr., B.R. 1092, Page ID # 7430.)  Indeed, Brown received a 16-level enhancement rather than an 18-level enhancement because some of the funds attributable to other co-conspirators were not added to his loss amount.

All told, the record fails to demonstrate that the district court clearly erred when it calculated the loss amount attributable to Defendant Brown.  Accordingly, the Court affirms the district court's 16-level adjustment to Brown's base offense level pursuant to U.S.S.G. § 2B1.1(b)(I).

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** Defendant Iossifov's convictions and sentence and similarly **AFFIRM** Defendant Brown's sentence.